**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT COURT OF PENNSYLVANIA**

| | |
|---|---|
| GORDIN & BERGER, P.C., EDWARD BERGER and DANIEL BERGER,<br><br>    Plaintiffs,<br><br>    v.<br><br>OLU OMODUNBI, LAWRENCE C. HERSH and LAW OFFICES OF LAWRENCE HERSH,<br><br>    Defendants. | **CIVIL ACTION**<br><br>**Case No.: 23-cv**<br><br><br>   **JURY TRIAL DEMANDED**<br><br><br>    **COMPLAINT** |

   Plaintiffs Gordin & Berger, P.C., Edward L. Berger and Daniel A. Berger (hereinafter collectively referred to as "G&B" or "Plaintiffs"), by and through their attorneys, Gordin & Berger, P.C., hereby file this Complaint and Jury Demand for damages and declaratory, injunctive and equitable relief against Defendants Olu Omodunbi (hereinafter "Omodunbi") and Lawrence C. Hersh and the Law Offices Of Lawrence Hersh (hereinafter collectively referred to as "Hersh") to enforce certain liability created by the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*, and for violations of state common law. In support thereof, Plaintiffs allege the following:

### INTRODUCTION AND SUMMARY OF CLAIMS

   1.  A common misperception about the FDCPA is that Consumers are the only class of persons that the statute protects. The statute, however, expressly acknowledges that protecting the marketplace for debt collectors that refrain from utilizing deceptive or abusive practices is

essential to its remedial purpose. Thus, the protection of non-violating debt collectors ("NVDCs") is also an integral part of the statutory framework.

2.     This intention is unequivocally stated both in 15 U.S.C. § 1692(c) by emphasizing the availability of "[m]eans other than misrepresentation or other abusive debt collection practices... for the effective collection of debts" and its intent to preserve traditional state enforcement remedies, as well as in 15 U.S.C. § 1692(e) by explicitly stating that one of the purposes of the act is "to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged."

3.     Further, one such means of protection that is specifically afforded to NVDCs is by creating a private right of action for damages when NVDCs are victimized by bad faith FDCPA litigation. As seen in 15 U.S.C. § 1692k, Civil Liability, § 1692k(a)(3) specifically incorporates litigation costs and attorney fees as an available item of damages, awarded as a matter of course to any successful Consumer but also awarded to a successful NVDC in the case of a suit that is brought in bad faith and/or for improper purposes.

4.     Moreover, as seen in the broad language of 15 U.S.C. § 1692k(d), "[a]n action to enforce **any** liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction," and accordingly, the instant action to enforce such liability for Defendants' bad faith FDCPA litigation is necessarily authorized by statute.

5.     Thus, Plaintiffs bring this action for damages arising under 15 U.S.C. § 1692k(a)(3) and further seek declaratory and injunctive relief in the form of a declaratory judgment of non-liability as to certain claims of Omodunbi for violations of various provisions of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (hereinafter "FDCPA"), and in

the form of an order enjoining the Defendants from bringing and/or continuing to prosecute claims for liability thereon.

6.      Additionally, Plaintiffs also assert certain claims for actual (direct), special (consequential), and punitive damages arising under Pennsylvania Common Law for abuse of process, for the numerous and rampant abuses of numerous court processes in both state and federal court proceedings primarily for perverse and improper purposes that those proceedings were not designed for.

7.      Finally, the RICO Act provides for a private right of action to any person that is injured in his business or property as a result of any violations of the statute, and any person, associated with an "enterprise" who conducts the enterprise's affairs through a pattern of racketeering activity may be liable to the injured party for damages. See, 18 U.S.C. §§ 1962(c) and 1964(c).

8.      In the present case, Plaintiffs maintain that the Defendants together constituted an "association-in-fact" enterprise based on the three pronged test of *Boyle v. United States* by sharing a common purpose and maintaining relationships between them with longevity sufficient to permit them to pursue the enterprise's purpose.

9.      Thus, where Defendants conducted the affairs of this association-in-fact enterprise through a pattern of racketeering activity as described herein, Plaintiffs bring this action for actual (direct), special (consequential), statutory, and punitive damages arising under the RICO Act, together with costs of suit and attorney's fees.

### JURISDICTION, VENUE AND CHOICE OF LAW

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, 15 U.S.C. § 1692k(d), and 18 U.S.C. §§ 1964(a) – (c).

11.     Additionally, this Court has subject matter jurisdiction over the supplemental claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in which a substantial part of the events and/or omissions giving rise to the claim occurred.

13.     Finally, Plaintiffs rely on the law of Pennsylvania where Defendant Omodunbi is subject to the general personal jurisdiction of Pennsylvania pursuant to 42 Pa.C.S.A. § 5301(a)(1)(ii) and where Defendant Hersh is subject to the specific personal jurisdiction of Pennsylvania pursuant to 42 Pa.C.S.A. §§ 5308 and 5322(a)(1)(ii) and where a substantial part of the events and/or omissions giving rise to this action occurred within the Commonwealth of Pennsylvania and where the brunt of the injuries sustained were felt by the Plaintiffs while they were located, conducting their business and/or residing in the Commonwealth of Pennsylvania.

## JURY DEMAND

14.     G&B demands a jury trial on all issues.

## PARTIES

15.     Plaintiff, Gordin & Berger, P.C., is a professional corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal office located at 1760 Market Street, Suite 608, Philadelphia Pennsylvania, 19103.

16.     Plaintiff, Edward L. Berger ("ELB") is the President and sole shareholder and beneficial owner of Gordin & Berger, P.C., which is a law firm that employs only two attorneys, ELB and his son, Co-Plaintiff Daniel A. Berger ("DAB") as well as two support staff.

17.     ELB is a natural person and resident of Camden County, in the State of New Jersey.

18.     DAB is a natural person and resident of Philadelphia County, in the Commonwealth of Pennsylvania.

19.     At all times relevant hereto, ELB and DAB were acting within the scope of their employment and duties as employees and/or officers of G&B.

20.     Further, both DAB and ELB are attorneys authorized to practice law in the State of New Jersey, as well as in the Commonwealth of Pennsylvania.

21.     At the same time, while Plaintiffs do regularly engage in the practice of debt collection activities, DAB and ELB hold the *public office* of Attorneys and Counselors at Law, and are bound, first, by their oaths of office and/or allegiance, as well as the Rules of Professional Conduct of Pennsylvania and New Jersey. ***See, N.J. Rev. Stat. § 41:1-2(2020); 42 Pa.C.S.A. § 2521***.

22.     Thus, sometimes DAB and ELB are acting as debt collectors, however, there are also occasions where DAB and ELB, holding the *public office* of Attorneys and Counselors at Law, and specifically as officers of the court whenever they are practicing law therein or entering an appearance, are acting, and can only act as, officers and/or instruments of the court. Moreover, both are, at all times, bound by their oaths of office, and the rules of professional conduct of both states.

23.     In the case of the Commonwealth of Pennsylvania, prior to "entering upon the duties of [their] office[s]," both ELB and DAB were required to take the following oath of office before a person authorized to administer oaths:

> "I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity, as well to the court as to the client, that I will use no falsehood, nor delay the cause of any person for lucre or malice."

*See, 42 Pa.C.S.A. § 2522.*

24.     Similarly, in the case of the State of New Jersey, "before [they] enter[ed] upon the execution of [their] trust, office or duty," both ELB and DAB were required to take the following oath of office before a person authorized to administer oaths:

> "I do solemnly swear (or affirm) that, to the best of my knowledge and ability, I will support and defend the Constitution of the United States against all enemies, foreign and domestic, and that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I demean myself as an Attorney At Law of this Court, uprightly and according to law. So help me God."

*See, N.J. Rev. Stat. § 41:1-2(2020); N.J. Ct. R. 1:27-5*.

25.     Defendant Omodunbi is a natural person and resident of the Commonwealth of Pennsylvania.

26.     Additionally, Omodunbi is a well educated individual with several degrees of higher education, specifically including a PhD in Economics that he obtained from Binghamton University.

27.     Defendant Lawrence C. Hersh is a natural person and resident of the State of New Jersey with a principal place of business located at 17 Sylvan Street, Rutherford, NJ 07070.

28.     Defendant Law Offices of Lawrence Hersh, is a either a separate legal entity organized and existing under the laws of the State of New Jersey, or is a sole proprietorship, with a principal place of business located at 17 Sylvan Street, Rutherford, NJ 07070.

29.     Additionally, Hersh Defendants are attorneys authorized to practice law in the State of New Jersey and the State of New York.

30.     Hersh Defendants were retained by Omodunbi to unsuccessfully defend him in two state court actions in the Superior Court of New Jersey, Hudson County, Law Division both

of which were entitled, <u>Rutgers, The State University of New Jersey v. Olu Omodunbi</u>: one commenced in the Special Civil Part, at Docket No. HUD-DC-12959-16 (hereinafter the "SCP Action") and then a second action at Docket No. HUD-L-1965-17 after the matter was transferred to the Law Division; both are collectively referred to as the "Collection Action."

31.     Plaintiffs were retained by, and represented, Rutgers, The State University of New Jersey (hereinafter "Rutgers") in the Collection Action which ultimately resulted in a judgment in favor of Rutgers and against Omodunbi.

32.     Finally, Hersh Defendants also represent Omodunbi in a federal action in the United States District Court for the District of New Jersey, styled <u>Olu Omodunbi v. Gordin & Berger, P.C. et al</u>, at Docket No. 2:17-cv-07553-ES-JAD (hereinafter referred to interchangeably as the "NJ District Action," the "FDCPA Action," the "NJ District Court Action," or the "FDCPA litigation") claiming to seek damages and declaratory relief.

### RELEVANT MATTERS OF PUBLIC RECORD

33.     The NJ District Court Action was administratively terminated without any judgment on the merits with respect to any claims presented therein on March 30, 2023.

34.     A substantial portion of Plaintiffs' business consists of debt collection and litigation services for a number of institutional clients including Rutgers.

35.     Plaintiffs' privity with Rutgers began on or about December 5, 2013, when Rutgers notified G&B that they were one of the successful bidders as part of the public bidding process based on Plaintiffs' "Proposal in Response to Rutgers University RFP and Terms For Outside Counsel Response Date 10/13/13," the terms of which contained therein govern G&B's contingency fee agreement with Rutgers (hereinafter "Rutgers Fee Agreement").

36.     Essentially, Rutgers, as a public entity, is required to utilize a public bidding process through either its procurement office, central collections office, office of general counsel, or some combination thereof, in order to award performance contracts with any outside vendors, including collection agencies and law firms, and as such, those accepted proposals are also matters of public record and within the public domain. *See* NJ Rev Stat § 18A:18A-1 *et seq.* (New Jersey's "Public School Contracts Law"). A true and correct copy of the Rutgers Fee Agreement has been attached hereto as **EXHIBIT 1**.

37.     Again, as a public state entity, this Rutgers Fee Agreement, like all of the relevant public contracts, are matters of public record. *See* NJ Rev Stat § 47:1A-5(e)("Immediate access ordinarily shall be granted to budgets, bills, vouchers, ***contracts***, including collective negotiations agreements and individual employment contracts, and public employee salary and overtime information.")

38.     Pursuant to the Rutgers Fee Agreement, Rutgers places delinquent accounts with G&B for collection based on a contingency fee arrangement, whereby G&B retains a percentage of any and all amounts it collects on Rutgers' behalf, which is their fee for professional services.

39.     The percentage that G&B retains, however, varies depending on a number of factors, including, but not limited to, whether the account is part of the Federal Perkins Loan Program governed by certain federal regulations (i.e. "Perkins Loan" account vs. "non-Perkins Loan" account), whether or not the account was previously placed with another collection agency or law firm, (i.e. first placements vs. second placements) and whether or not G&B has to commence and/or pursue litigation.

40.     Of relevance to this action, pursuant to their contingency fee agreement with Rutgers, G&B is entitled to a forty (40%) percent contingent fee on non-Perkins accounts that

are second placement or where G&B has to commence and/or pursue litigation, which is their fee for professional services. Moreover, Rutgers incurs the obligation to pay G&B's fee upon placing an account with them for collection.

## PRIOR ADJUDICATION SUBJECT TO FULL FAITH AND CREDIT

41.     As noted above, the Plaintiffs represented Rutgers in the Collection Action which ultimately resulted in the entry of a Judgment (entered on Summary Judgment Motion) by the Superior Court of New Jersey, in favor of Rutgers and against Omodunbi, and docketed with the Clerk of the Superior Court on October 23, 2018, at No. J-183978-18, in the amount of $19,487.34 (hereinafter "Judgment Debt"). Attached hereto as **EXHIBIT 2** is an authenticated copy of the Judgment pursuant to 28 U.S.C. § 1738 which is entitled to full faith and credit.

42.     As seen therein, this Judgment was based on a September 26, 2018 Order by the Superior Court, granting Rutgers' motion for summary judgment in consideration of the moving and opposition papers and arguments of counsel, and for good cause shown, based on "the reasons set forth on the record following oral argument on September 20, 2018."  See **EXHIBIT 2**.

43.     Also attached hereto as **EXHIBIT 3** is a true and correct copy of the September 20, 2018 Summary Judgment Hearing Transcript, evidencing the issues that were actually litigated and then relied on by the New Jersey Court in rendering its judgment on the merits.

44.      The referenced motion papers, together with the findings that were set forth on the record at the Summary Judgment hearing, note that the following issues of fact have all been litigated and are subject to issue preclusion under applicable New Jersey law:

45.     Omodunbi attended Rutgers during the fall 2009 and spring 2010 semesters while pursuing a master's degree in mathematical finance. See **EXHIBIT 3, at 4:6 – 4:10.**

46.     Omodunbi enrolled in four classes during the fall, incurring a bill for $16,130.70, failed to make payment but signed one of three promissory notes on September 16, 2009, promising to pay $16,255.70 which included a $125.00 late fee on top of the base tuition bill, all of which was due November 16, 2009. **Id. at 4:11 – 4:16.**

47.     Omodunbi subsequently obtained private financing from Wells Fargo in the amount of $15,000 which he applied to the promissory note obligation, leaving a balance of $1,130.70 thereafter signing a second promissory note to pay that remainder. **Id. at 4:17 – 4:21.**

48.     Omodunbi has made timely monthly payments towards his Wells Fargo obligation. **Id. at 4:22 – 4:25.**

49.     Omodunbi then incurred a bill for $12,410.70 for the spring 2010 semester, which, when added to the $1,130.70, brought his total due and owing for both semesters to $13,541.40. **Id. at 4:25 – 5:4.**

50.     Thereafter, on February 4, 2010 Omodunbi was "deregistered" from classes due to non-payment and on that same day, in exchange for being allowed to reregister, Omodunbi then signed a third and final promissory note for a total of $13,541.40. **Id. at 5:5 – 5:16.**

51.     Attached hereto as **EXHIBIT 4**, is a true and correct copy of that promissory note which was sued on in the Collection Action, and ultimately merged with the Judgment Debt when final judgment was rendered.

52.     The terms of the promissory note stated Omodunbi was to pay $6,770.70 by March 2010 and then a second payment of the same amount was due in April 2010. See **EXHIBIT 3 at 5:17 – 5:20; EXHIBIT 4**.

53.     The promissory note also obligated Omodunbi to pay for "any charges accrued through interest or penalty" and further contained a promise to pay for "all collection costs... in

the event Rutgers University referred [the] account to an attorney for collection," which the trial court concluded constituted an express agreement to fee-shifting. See **EXHIBIT 4; EXHIBIT 3 at 5:20 – 5:24**.

54.     When Omodunbi made no payments, a $50.00 late fee was added to his account as of April 2010. See **EXHIBIT 3 at 5:25 – 6:1**.

55.     Thereafter, Omodunbi took a leave of absence in the late spring of 2010 without formally withdrawing; however, this had no material impact on his obligations under the promissory note. **Id. at 6:3 – 6:5; 26:24 – 27:17.**

56.     Thereafter, from December 2010 until January of 2012, the in house accounting service for Rutgers, called University Accounting Service, sent no less than fourteen monthly statements listing late penalties that continued to accrue on a monthly basis and then from February 2012 to May of 2013, the same internal accounting office also sent an additional sixteen monthly statements indicating additional fees that were continuing to accrue each time demanding payment. **Id. at 6:9 – 6:18.**

57.     In total, between December 2010 and May 2013, $484.00 in late fees/penalties were added to Omodunbi's account in accordance with the terms of the promissory note, bringing the total amount that was then due and owing to $14,075.40. See **EXHIBIT 2**.

58.     Thereafter, on May 7, 2013, Rutgers placed Omodunbi's account with a collection agency called Enterprise Recovery Services (ERS) and in September of 2013, while Omodunbi was attending Binghamton University, the collection agency reached him and began to reopen negotiations about settling the outstanding debt. See **EXHIBIT 3 at 6:19 – 6:25**.

59.     At that time, Omodunbi made an offer to pay a lump sum payment of $6,000.00 in settlement of the outstanding balance which Rutgers then rejected and the collection agency

subsequently returned the account to Rutgers as unsuccessfully adjusted, finally referring the

account to G&B in 2016 for collection and litigation based on a total amount that was then due

and owing in the amount of $14,075.40 "made up of principal, late fee, interest and penalties."

**Id.** **at 7:1 – 7:10**.

60.     As noted above, when Omodunbi's account was referred to G&B for collection, it

was already classified as a "second placement" and, upon placement with G&B for collection on

or about September 1, 2016, Rutgers incurred the obligation to pay G&B their contingency fee of

40% in accordance with the terms of the Rutgers Fee Agreement.

### FACTUAL ALLEGATIONS

### *Plaintiffs' Initial Communication with Omodunbi*

61.     On September 27, 2016 Plaintiffs prepared and sent a first demand letter to

Omodunbi (the "Initial Communication") that was two pages:

a.      The first page consisted of a cover letter containing information that was

unique to Omodunbi and the debt that was owed by him to Rutgers in accordance with 15

U.S.C. §§ 1692g(a)(1) and 1692g(a)(2); and

b.      The second page consisted of a standard form enclosure containing the

three generic statements as required by 15 U.S.C. §§ 1692g(a)(3), 1692g(a)(4), and

1692g(a)(5).

62.     Additionally, the first page was printed on Plaintiff's Letterhead, which is a beige

or cream color, while the second page was made by copying or reprinting this form enclosure on

standard white paper.

63.     As a matter of office policy, Plaintiffs made a copy of this Initial Communication

on standard white paper and placed it in their paper file, however, because the second page

enclosure contains no unique information, Plaintiffs do not make an extra copy of this enclosure to keep in their paper file as well.

64.     The first page of the Initial Communication was printed on beige letterhead and a copy of this first page was then made and placed in the paper file.

65.     Thereafter, an envelope with Omodunbi's address was also printed and a copy or reprint of the form enclosure was added to the original first page, and this entire packet containing the beige first page, the form enclosure printed on white paper, and the envelope was presented to ELB, together with the file, for review and signature.

66.     Typically, the file copy of the first letter is also hole punched and tied down on the inside of the paper file by an employee before it is presented for review, and only the original letter is signed, however, in the rare case where an adjustment or edit needs to be made, the copy inside the file will be removed and replaced.

67.     After reviewing the Initial Communication and checking for accuracy, ELB proceeded in accordance with office policy by signing the letter and then placing it with the second page enclosure and the envelope, all held together by a paperclip, in basket for outgoing mail, along with other packets of first letters that are prepared and reviewed in the same manner.

68.     Thereafter, another employee will prepare each first letter, and following that same procedure completed the preparations for the Initial Communication to Omodunbi by folding the first and second pages together, placing them in an envelope, sealing the envelope, placing it through a mail meter machine that prints postage, and then placing the stamped envelope in another basket or pile with all other outgoing mail that is ready to be dropped off with the outgoing mail for the entire building in the mailroom.

69.     This original letter, printed on beige letterhead, baring ELB's signature, and containing the second page enclosure was received by Omodunbi, and was at one time in his possession.

70.     However, as will be explained in more detail, the original Initial Communication with the form enclosure has since been concealed and/or destroyed by Defendants.

71.     Attached hereto as **EXHIBIT 5** is the best available copy of their Initial Communication that Plaintiffs kept in their paper file, together with the enclosure, which, as seen therein, contains both pages thereof.

72.     However, as already noted, this copy of the Initial Communication was made prior to receiving ELB's signature, was whole punched and tied down in their office file without an extra copy of the second page enclosure.

73.     Additionally, the second page enclosure that has been attached hereto as **EXHIBIT 5** is a computer generated copy of the actual word document that was first created on May 26, 2015, and last saved and printed on August 3, 2017, which, as seen in the computer generated copy, contains a date stamp that is automatically added/updated upon opening the word document, and contains an updated date of June 5, 2023, reflecting the date that this document was re-opened and recopied for purposes of attaching as an exhibit to this complaint.

74.     Attached hereto as **EXHIBIT 5A**, is a screenshot showing the computer file information reflecting when it was created and when it was last saved and printed.

75.     Also attached hereto as **EXHIBIT 5B**, is another copy of this document that was printed on December 27, 2016, and was another printed copy that was kept in the office and eventually sent to Hersh on December 15, 2017, to provide him with a copy of what was actually sent to Omodunbi, originally on September 27, 2016.

76.     Finally, attached hereto as **EXHIBIT 5C**, is a black and white scanned copy of only the first page of the Initial Communication that was sent to Omodunbi, and concealed by Defendants for nearly five years.

77.     Specifically this scanned original, attached hereto as **EXHIBIT 5C**, containing only the first page of the letter, was never provided to the Plaintiffs for copying and inspection despite demand having been made in September of 2019 during the discovery phase of the NJ District Action and was only first introduced and submitted as a scanned copy on December 19, 2022, and was concealed by the Defendants so that the Plaintiffs could not inspect it for certain folds and distinctive features to prove that the letter was actually sent with a second page enclosure that the Defendants continued to conceal or have since destroyed.

78.     As seen in **EXHIBIT 5**, this Initial Communication (including the enclosure) contained all of the information which is required to be disclosed by 15 U.S.C. § 1692g(a).

79.     Moreover, as further seen therein, this Initial Communication (including the enclosure), as a whole, was not inconsistent with, nor did it overshadow, any of Omodunbi's statutory rights in violation of § 1692g(b).

80.     In fact, on or about Monday, October 10, 2016, specifically as a direct result of having been adequately apprised of his statutory rights, Omodunbi sent a letter to G&B requesting verification of the debt in accordance with his rights under 15 U.S.C. § 1692g(a)(4), which was received by their offices on October 17, 2016.

81.     A true and correct copy of the letter that was sent by Omodunbi in response to G&B's Initial Communication has been attached hereto as **EXHIBIT 6**.

82.     As seen therein, this document also shows an identification marking at the top right corner thereof reflecting an exhibit "ID" of "A-2" and a date of May 15, 2018,

corresponding to the day that Defendant Omodunbi sat for his deposition in the Collection Action, and this document was, at that time, introduced, and thereafter examined and authenticated by Omodunbi as a letter that he believed to have written. See **EXHIBIT 6**.

83.     Plaintiffs responded to Omodunbi's request for verification by sending him itemized statements of the tuition charges that were incurred for the Fall 2009 and Spring 2010 Semesters, together with another statement from Rutgers reflecting the total late fees/penalties that had accrued prior to placement with G&B and demanded payment for the $14,075.40 that was then due and owing. See a true and correct copy of the file copy of this October 25, 2016 verification letter attached hereto as **EXHIBIT 7**.

84.     As seen therein, this copy of the Plainitffs' file copy was once again made prior to signature, and does not include copies of the documents that were enclosed with this letter. See **EXHIBIT 7**.

85.     True and correct copies of the three documents that were sent with this October 25, 2016 verification letter, however, were attached to the complaint and, the amended complaint that was ultimately filed in the Collection Action and were referred to in those pleadings as "Exhibit A" and "Exhibit B" and are also contained in the copy of the March 7, 2017 motion that was filed in the Collection Action that has been attached to this complaint as **EXHIBIT 13**.

86.     Finally, in response to receiving verification of the underlying debt, Omodunbi responded with another letter that was received by G&B on or about November 30, 2016, acknowledging receipt of their verification letter and stating that "[d]ue to [his] current condition, [he was] only able to pay $25 per month" and requested G&B's assent to that payment arrangement. A true and correct copy this second letter that was sent by Omodunbi and received by G&B on November 30, 2016 has been attached hereto as **EXHIBIT 8**.

87.     Subsequent to receiving this letter, when it became apparent that Omodunbi was unlikely to make voluntary payments, in accordance with their office policies, the file was given to DAB with other similar files for the preparation of a complaint and the institution of suit and on or about December 21, 2016, G&B commenced the SCP Action on Rutgers' behalf.

### *Omodunbi's Attempts to Negotiate with Plaintiffs for a Favorable Settlement over the Course of Four Phone Calls*

88.     Additionally, prior to receiving Omodunbi's letter, Omodunbi called the Plaintiffs' offices on October 14, 2016, the first of the "Four Phone Calls" that are referenced in Defendants' FDCPA claims, in an attempt to negotiate a settlement of the underlying debt, and ELB took contemporaneous notes of this phone call that were stored in Plaintiffs' computer file.

89.     The other three relevant phone calls between the Plaintiff and Omodunbi all took place subsequent to commencing the SCP Action and occurred on January 3, 2017, January 4, 2017, and January 6, 2017, and on each of those occasions, Edward L. Berger contemporaneously recorded the contents of what was discussed during those phone calls on each day respectively.

90.     Attached hereto as **EXHIBIT 9**, are four (4) true and correct copies of a printed reproduction of G&B's computer file, which is a business record created and kept in their ordinary course of business, with each of the four conversations highlighted for emphasis.

91.     As seen therein, each of those conversations consisted solely of settlement negotiations between G&B and Omodunbi, culminating in the January 6, 2017 Settlement Offer that was later memorialized by ELB in a subsequent email and at no point did G&B make any threats whatsoever, nor did G&B make any false or misleading statements.

92.     Importantly, because the SCP Action had already been commenced and Omodunbi had been served with a complaint and summons, the negotiations that took place in

January of 2017 also necessarily discussed proposed dispositions of the pending lawsuit, as seen in the January 6, 2017 Settlement Offer that was revoked two weeks later.

### *Plaintiffs' January 6, 2017 and January 20, 2017 Settlement Communications*

93.     As noted above, on January 6, 2017, G&B sent Omodunbi an email which memorialized their oral conversation on that same day in which Omodunbi offered to settle the debt that had since become the subject of the Collection Action by making regular monthly payments of $300 per month, until the entire balance was paid full. A true and correct copy of this 01/06/2017 Email has been attached hereto as **EXHIBIT 10**.

94.     Additionally, G&B agreed, on behalf of Rutgers, that in the interim it would pause its litigation efforts and that upon receipt of the first installment payment G&B would file a Stipulation of Dismissal Without Prejudice, which would terminate the litigation proceedings, and in effect, the writing itself constituted a binding offer that was to be accepted by Omodunbi's performance *visa-vi* delivery of the first installment payment.

95.     Furthermore, the use of the word "immediately" in describing when the first installment payment was to be received by, together with the statement that the "offer is made for settlement purposes only and with reservation of all rights," further indicated a clear intent that time was an essential term of the offer, and that G&B reserved the right to revoke the offer if Omodunbi's performance was not completed in time.

96.     Omodunbi received that email but never responded, or indicated that he had changed his mind, or indicated that he had a different understanding based on their January 6, 2017 conversation.

97.     When another two weeks passed without any follow up and without Omodunbi's acceptance of the settlement agreement by tendering payment, G&B effectively revoked this

offer and notified Omodunbi that it would be resuming its litigation efforts by way of the 01/20/2017 email specifically referencing the language of G&B's time sensitive offer.

98.     A true and correct copy of this 01/20/2017 Email has been attached hereto as **EXHIBIT 11**.

99.     As seen therein, G&B did not threaten any action that could not legally be taken, and they certainly did not mislead Omodunbi by suggesting that he was already in "default" and he had run out of time to file an answer to the complaint.

100.     Just the opposite, to the extent that the definition of the word "proceed" means "to continue after a pause or interruption" or "to go on in an orderly regulated way," G&B's statement that it would "be proceeding to enter judgment against" Omodunbi was axiomatically a non-deceptive statement because it stated that Plaintiffs would only utilize the regulated and legal process, whatever that entailed, of obtaining a judgment. Moreover, the fact that G&B had previously indicated that they would be pausing those efforts to obtain a judgment through the prescribed legal process, the use of the word "proceeding" clearly meant that G&B would be resuming those efforts that they had temporarily paused.

101.     Furthermore, it is equally evident that Omodunbi knew precisely what was meant by G&B's 01/20/2017 Email – that because they had not yet received the first installment, G&B was effectively revoking their time-sensitive offer of settlement, and that they would be resuming their efforts to litigate and, as evidenced by his retention of Hersh and timely filing of an answer to the complaint before any default was entered, Omodunbi was not confused or mislead by G&B's 01/20/2017 Email.

### Defendants' Formation Of An Association-in-Fact Enterprise

102. On or about January 20, 2017, Omodunbi retained Hersh to represent Omodunbi in his defense in the Collection Action and for the prosecution of certain FDCPA claims that were then discussed and contemplated.

103. Specifically, as part of their engagement, Hersh agreed to represent Omodunbi in the Collection Action and specifically to defend Omodunbi therein. Further, Hersh agreed to represent Omodunbi without the payment of any fees provided that: (i) in the first instance, Omodunbi agreed to retain Hersh to represent Omodunbi in a proposed federal lawsuit for claims of FDCPA violations; (ii) Hersh would be entitled to fees as a result of any settlement in the FDCPA action proposed to be filed; (iii) Omodunbi would give Hersh full authority to act on Omodunbi's behalf in both the Collection Action and the FDCPA action that was then contemplated; (iv) Hersh would claim, on Omodunbi's behalf, as an element of actual damages in an FDCPA action that was then contemplated, all of Hersh's attorney fees for his services performed in connection with the Collection Action; and (v) if Hersh was unable to obtain a favorable settlement in the Collection Action, Hersh would ask on Omodunbi's behalf that any settlement payment for the FDCPA action then contemplated would fund the underlying contract debt or any judgment that had been entered thereon.

104. At the time that Hersh and Omodunbi discussed and agreed to the above terms for their engagement, Hersh knew nothing more about the underlying facts of Omodunbi's circumstances other than that Rutgers was claiming that Omodunbi owed them a debt, that Rutgers had referred the matter to G&B for collection, that G&B had already filed a complaint that was then pending in the Superior Court of New Jersey, Hudson County, Special Civil Part, and that Omodunbi had been served with same and that an Answer was due on or before January 27, 2017.

105.    On information and belief, during their initial discussions, Hersh specifically explained his intended legal strategy to Omodunbi by stating that Hersh typically handles these kinds of cases and he is usually able to obtain a quick favorable settlement of 20% to 50% of the amount demanded or claimed to be owed on the underlying debt.

106.    Furthermore, Hersh also represented to Omodunbi, in explaining his intended legal strategy, that even if Hersh is unable to obtain a favorable settlement on the underlying debt, that he would put forth a defense on Omodunbi's behalf by denying everything, and adding to the litigation expenses, such that even if no settlement of the debt is obtained and a judgment is entered, Omodunbi would not have to worry about paying the judgment or Hersh's fees because Hersh would thereafter claim as damages in an anticipated FDCPA lawsuit his fees incurred defending in the Collection Action, which would ultimately be used as leverage to obtain a settlement in the FDCPA action to fund any payment on account of the debt having been reduced to judgment.

107.    In short, Hersh specifically designed a legal strategy that was portrayed to Omodunbi as a win-win situation: either Omodunbi would obtain a quick settlement at a substantial discount, or protracted litigation would present an opportunity for Hersh to file an FDCPA action and use those proceedings as leverage to obtain a settlement that would offset any obligation to pay a judgment entered and Hersh would solely look to the FDCPA litigation to pay for his time spent defending in the collection action and/or prosecuting the FDCPA action.

108.    Thereafter, upon agreeing to this proposal, entering into an attorney – client relationship, and engaging Hersh to enter an appearance on Omodunbi's behalf in the Collection Action, Defendants formed an "association-in-fact" enterprise with the common purpose of avoiding/defeating/ and/or minimizing Omodunbi's debt that he owed to Rutgers that was the

subject of the Collection Action, and as will be set forth at length herein, that enterprise

continued for an extended period of time allowing for the pursuit of the enterprise's purpose.

109.    Additionally, as will be explained in more detail below, this legal strategy,

however, was necessarily a perversion of the legal process, since adding litigation expenses for

the primary purpose of claiming those additional expenses as damages in a separate action for

FDCPA violations in order to coerce a compromise of an underlying contract claim is not a

proper object of any of the specific processes that were employed during the Collection Action

proceedings.

### *Defendants Abuse the Legal Process At The Pleadings Stage In Furtherance Of The Enterprise's Purpose Causing Plaintiffs To File And Serve Four Motions During The Collection Action*

110.    The concept of notice is an essential requirement that is fundamental to the proper

functioning of the legal process. It is the bare minimum that is required so that all proceedings

will comport with fundamental fairness. And when an attorney has entered an appearance in a

case, ensuring that an adverse party is provided with proper and adequate notice is a function that

he is duty bound to perform in his capacity as an officer of the court.

111.    Accordingly, when responding to the initial complaint that Plaintiffs filed in the

Collection Action on Rutgers' behalf seeking to collect the debt that Omodunbi owed, Hersh had

an obligation to provide the Plaintiffs with proper and adequate notice of the nature of

Omodunbi's defense(s) to the contract claims and any other claims he might have based on the

same transactional facts. Included in this obligation was a requirement to perform an inquiry into

the facts based on the information that was reasonably available under the circumstances. This

also included an obligation not to submit a filing for any improper purpose such as to cause

unnecessary delay or needless increase in the cost of litigation. And finally, this also included an

obligation to disclose whether any other action concerning non-parties that are potentially liable based on the same transactional facts was then contemplated. *See*, e.g. N.J. Court Rules 1:4-8 *et seq.*; N.J. Court Rules 4:5-1 *et seq.*; N.J. Court Rules 4:5-3 *et seq.*; N.J. Court Rules 4:5-4 *et seq.*; N.J. Court Rules 4:5-5 *et seq.*; N.J. Court Rules 4:29-1 *et seq.*

112. Despite this obligation Defendants abused the legal process and intentionally sought to deprive Plaintiffs of their rights to fundamental fairness when they filed their answer to the initial complaint in the Collection Action on January 27, 2017, generally denying all of the allegations in the complaint in a single paragraph and failing to disclose that Defendants already intended to assert liability against the Plaintiffs based on the same transactional facts claiming that the Plaintiffs soughtt to collect excess debts thereby violating the FDCPA.

113. Moreover, this was done for the improper purposes of creating redundant litigation, allowing Defendants to test their strategies with one litigation in which they could, unsuccessfully, challenge the Plaintiffs' case through discovery while denying Plaintiffs the right or ability to challenge Defendants' case with discovery over any FDCPA related issues; afford Defendants a second bite at the apple for any factual issues that overlapped between both cases;[1] and upon learning of the weakness of their theories based on the facts adduced in the Collection Action – adjust their strategy in the FDCPA litigation to avoid, delay or obstruct the discovery of the same facts that would only weaken, if not undermine entirely, the Defendants' case.

114. That same day, after reviewing the answer that was filed in violation of numerous court rules and amounting to an abuse of the legal process, DAB contacted Hersh in an attempt

---

[1] As was admitted by Hersh after Judge Costello announced her decision at the conclusion of the Summary Judgment hearing, in which he cavalierly turned to DAB immediately after going off the record and laughed about having another chance to argue the same points.

to avoid further unnecessary delay and needless increase in the cost of litigation first by phone, and then by email.

115.    A true and correct copy of this January 27, 2017 Email, together with the three promissory notes that were attached thereto, has been attached hereto as **EXHIBIT 12**.

116.    As seen therein, Plaintiffs went above and beyond to treat Defendants fairly, to avoid further unnecessary delay and needless increase in the cost of litigation, and sought to come to an amicable resolution.

117.    Specifically, Plaintiffs provided Hersh with all three signed promissory notes that were signed by Omodunbi, explained their reasoning for not yet seeking the recovery of attorney fees, notified Defendants of their intentions to amend the complaint to "add an additional claim for attorney fees and... [trigger] the heightened pleading requirements associated with claims based on a properly attached promissory note" but indicated their willingness to negotiate a reasonable settlement offer and invited his response.

118.    This January 27, 2017 Email was also a communication from a debt collector to a consumer's attorney as covered by 15 U.S.C. § 1692c(a)(2), however, Hersh never responded to this communication, let alone within a reasonable period of time.

119.    Consequently, when Plaintiffs never received a response from Hersh, they prepared and filed their motion to amend the complaint on March 7, 2017. A true and correct copy of this 03/07/2017 Motion has been attached hereto as **EXHIBIT 13**.

120.    Crucially, in filing this 03/07/2017 Motion, as mentioned above, Plaintiffs were duty bound to provide proper and adequate notice to Omodunbi, as the adverse party in the Collection Action, by serving copies of same in accordance with Court Rules and applicable law.

121.     Moreover, consistent with the federal constitutional minimum that proper service requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections[,]" and particularly in light of Hersh's failure to respond to Plaintiff's Email from over five (5) weeks prior, when Plaintiffs attempted to effectuate service of the 03/07/2017 Motion, they did so by sending copies of the motion papers via certified and regular mail to both Omodunbi and Hersh, and further certified to these facts in the their affidavits of service that were included in the motion papers. See **EXHIBIT 13**.

122.     As seen on page four of the 03/07/2017 Motion papers, Plaintiffs submitted a certified statement in lieu of an affidavit, entitled "CERTIFICATION OF SERVICE" that attested to the following:

> I, EDWARD L. BERGER, ESQUIRE, attorneys for [Rutgers], certify and state that: I served the enclosed Notice of Motion on the Defendant, OLU OMODUNI in the following manner:
>
> I mailed the Defendant, OLU OMODUNBI, along with Defendant's Attorney, LAWRENCE C. HERSH, ESQ., a copy of the enclosed Notice of Motion, Certifications, Certification of Service, and an Order, which were sent by regular and certified mail, return receipt requested numbers 9214 8969 0099 9790 1006 217 376 & 217 437... addressed... as set forth in the Notice...
>
> **I CERTIFY** that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*See*, **EXHIBIT 13**, at p. 4.

123.     Additionally, as seen on page two of the 03/07/2017 Motion papers, Plaintiffs submitted a Notice of Motion which was addressed to Hersh, as "attorney for defendant" at "17 Sylvan Street, Suite 102B, Rutherford, NJ 07070" as well as to, Omodunbi at his then address of "61 Tuers Avenue, Apt. 1, Jersey City, NJ 07306." *See* **EXHIBIT 13**, at p. 2.

124.    Importantly, consistent with the FDCPA's purpose of preserving traditional state court remedies for debt collection, and mindful of the limited scope of federal law that cannot intrude on States' sovereignty by interfering with the proper functioning of state courts, the FDCPA expressly excludes from the Act's coverage "any person while... attempting to serve legal process on any other person in connection with the judicial enforcement of any debt." *See*, 15 U.S.C. § 1692a(6)(D); (also known, or commonly referred to, as the "process server exemption").

125.    Thus, Plaintiffs were not acting as "debt collector[s]... while... attempting to serve legal process" of the motion papers and the FDCPA, therefore, did not apply to them during that period of time that they were attempting service of the 03/07/2017 Motion.

126.    Just the opposite, because Plaintiffs, in their capacity as officers of the court, were duty bound to provide proper and adequate notice to Omodunbi of the 03/07/2017 motion papers, the FDCPA's "process server exemption" necessarily carves out such persons during the period of time that they are attempting service so as to not risk deterring or interfering with such person's ability to provide the consumer with adequate notice.

127.    Defendant Hersh subsequently contacted the Plaintiffs after receiving notice of the 03/07/2017 Motion by telephoning their office two days later on or about March 9, 2017 and sought to settle the debt on Omodunbi's behalf for a lump sum payment of $3,500.00, which Plaintiffs immediately rejected.

128.    During this conversation, however, Hersh did not ask about or discuss the motion, nor did he ask about Plaintiffs method of service on both Omodunbi and Hersh, nor raise any objection to this method of service, or attempt to assuage their obvious concerns that providing motion papers only to Hersh would not be enough to give Omodunbi adequate notice thereof.

129.    Accordingly, after being notified that their attempts to serve motion papers would include sending copies of the papers directly to Omodunbi, Hersh's contact with the Plaintiff's in which he failed to raise any such objection, under the circumstances, would also be considered consent to direct contact with a consumer under 15 U.S.C. § 1692c(a)(2), at least for the limited purpose of sending copies of motion papers for purposes of providing the consumer with notice of such motions.

130.    Thereafter, when the trial court subsequently rejected the 03/07/2017 Motion for including in the requested relief a request to transfer the matter to the Law Division in addition to their request to amend the complaint, Plaintiffs were forced to re-file and serve the same motion, but this time without including the request to transfer, which would come later as a separate motion to the Law Division only after the motion to amend was granted.

131.    This revised motion just to amend the complaint was filed on March 21, 2017 (the "03/21/2017 Motion"), and was virtually identical to the 03/07/2017 Motion with only the single correction.

132.    Once again, upon the filing of the 03/21/2017 Motion, Plaintiffs were duty bound to provide proper and adequate notice to Omodunbi, which they did by sending copies of the motion papers in the same manner as before, and just as before, the "process server exemption" necessitated that the FDCPA did not apply to them during this time period that they were performing such acts.

133.    This 03/21/2017 Motion was subsequently granted without any objection from Omodunbi or Hersh, on April 20, 2017, and a true and correct copy of that Order has been attached hereto as **EXHIBIT 14**.

134.    Although Plaintiffs had requested sixty (60) days to file the subsequent motion to transfer to the law division, specifically for the purposes of allowing them time to have meaningful settlement discussion with Defendants before Plaintiffs had to prepare another motion, the trial court, gave them only six (6) days, requiring that any motion to transfer had to be "returnable no later than May 12, 2017."[2] See, **EXHIBIT 14**.

135.    That same day, Plaintiffs sent a copy of the order granting their motion to amend the complaint to include a claim for attorney fees based on the promissory notes, and once again invited Hersh to confer with Omodunbi and make a reasonable settlement offer, specifically advising that "if [Omodunbi was] unable to come up with a large enough lump sum payment" Plaintiffs were "willing to work with him to make payments over time but that [was]... the best [they could] offer" under the circumstances.

136.    A true and correct copy of this 04/20/2017 email from DAB to Hersh has been attached hereto as **EXHIBIT 15**.

137.    Once again however, although Hersh knew that Plaintiffs attempts to serve motion papers would include sending copies of the papers directly to Omodunbi, when Hersh responded to the Plaintiff's 04/20/2017 Email later that day, he again failed to raise any objection to their method of service, which would further be considered consent to direct contact with a consumer under 15 U.S.C. § 1692c(a)(2), at least for the limited purpose of sending copies of motion papers for purposes of providing the consumer with notice of such motions.

138.    In fact, Hersh's response to Plaintiff's 04/20/2017 Email came only fifteen (15) minutes later and consisted solely of unreasonable settlement negotiation tactics repeating the

_____

[2] State practice in the New Jersey Law Division is that motions are only heard on certain days. Moreover, because a motion has to be served at least sixteen (16) days prior to the proposed return date, in order to meet the Court's time requirements of the 04/20/2017 Order, Plaintiffs were only afforded six days to prepare and file their motion to transfer.

previous offer of $3,500 and insisting that the Plaintiffs "cannot expect [his] client to bid against himself." A true and correct copy of this response is attached hereto as **EXHIBIT 15A**.

139.    Finally, frustrated with Hersh's unreasonable tactics, Plaintiffs thereafter responded by reminding Hersh that this $3,500 offer was immediately rejected after they filed their 03/09/2017 Motion and made two more "counter-offers" both of which were time sensitive, in the hopes that Defendants would come back with a reasonable offer or payment plan, but unaware that Defendants had already agreed to a strategy that would involve the institution of the instant federal lawsuit to coerce a much steeper discount or avoid paying anything towards the debt entirely.

140.    Thereafter, in accordance with the 04/20/2017 time requirements, Plaintiffs prepared and filed their motion to transfer (the "04/24/2017 Motion") four days later on 04/24/2017, with a return date of May 12, 2017.

141.    Once again, upon the filing of the 04/24/2017 Motion, Plaintiffs were duty bound to provide proper and adequate notice to Omodunbi, which they did by sending copies of the motion papers in the same manner as before, and just as before, the "process server exemption" necessitated that the FDCPA did not apply to them during this time period that they were performing such acts.

142.    Defendants did not oppose this motion either, however Hersh called Plaintiff at their offices the day before the return date of the pending motion to transfer, on May 11, 2017, and the following exchange took place over the course of two phone calls:

    a.    Once again, although Hersh knew that Plaintiffs' attempts to serve motion papers would include sending copies of the  papers directly to Omodunbi, Hersh again failed to raise any objection to Plaintiff's method of service and thus consented to direct

contact with a consumer under 15 U.S.C. § 1692c(a)(2) for the limited purpose of sending copies of motion papers for purposes of providing the consumer with notice of such motions;

b.      Additionally, Hersh for the first time, revealed Defendants' unreasonable expectations that they would be seeking to settle the debt for "25% - 50%" of the amount of the debt, notwithstanding the fact that Omodunbi had signed a promissory note which called for fee-shifting in addition to the repayment of the principal obligation and applicable late fees; and

c.      Finally, Hersh also specifically offered, on Omodunbi's behalf, a lump sum payment of $5,000 which Plaintiffs immediately rejected.

143.    The next day, on May 12, 2017, the NJ Superior Court Law Division granted the motion to transfer and the Collection Action was thereafter transferred accordingly as a suit on the amended complaint based on the signed promissory note and incorporating a demand for collection costs including attorneys' fees.

144.    Crucially, under the state practice, which is to say the legal process utilized, a defendant to an action based on a signed promissory note is subjected to heightened pleading requirements, creating a legal entitlement designed by the state practice to protect the Plaintiffs, their clients, and other similarly situated litigants from unreasonably expensive and protracted proceedings when suing on a signed promissory note that is properly attached to a complaint. *See*, e.g. N.J. Court Rules 1:4-8 *et seq.*; N.J. Court Rules 4:5-1 *et seq.*; N.J. Court Rules 4:5-3 *et seq.*; N.J. Court Rules 4:5-4 *et seq.*; N.J. Court Rules 4:5-5 *et seq.*

145.    However, Defendants again abused that process, perverting the state practice, and depriving the Plaintiffs of their commensurate rights identified and protected by court rules when

they served their answer to the amended complaint in the Collection Action on June 16, 2017,
again generally denying all of the allegations in the complaint in a single paragraph, and
specifically employing a fraudulent and abusive scheme to engage in sham litigation by
claiming, in bad faith, that Omodunbi could not recall whether he signed the promissory notes
and could not tell whether it was his signature thereon, for the purposes of denying all of the
allegations on the basis of a lack of information.

146.    A true and correct copy of Defendants' 06/16/2017 answer to the amended
complaint has been attached hereto as **EXHIBIT 16**.

147.    Moreover, as seen therein, this amended pleading once again contained a
fraudulent certification "that no other action or arbitration proceeding [was then] contemplated,"
based on Defendants' failure to disclose that they already intended to assert liability against the
Plaintiffs based on the same transactional facts claiming that they sought to collect excess debts
thereby violating the FDCPA.

148.    However, Defendants' necessarily abused and perverted the process when they
specifically denied the authenticity of the promissory notes further committing violations of 18
U.S.C. §§ 1343 and 1503(a).

149.    Between May and September of 2017, Plaintiff and Hersh exchanged
communications on more than half a dozen occasions primarily concerning Defendants' abuse of
court processes during the pleading phase and ultimately culminating in a motion hearing in
October of 2017.

150.    Specifically, Plaintiffs attempted to enforce their rights under applicable laws and
court rules by compelling that the Defendant properly amend his answer by serving Hersh with a
notice and demand to amend under the applicable rules concerning frivolous filings.

151.    Rather than amend the pleadings, however, Hersh, instead, harassed the Plaintiffs with duplicative and burdensome discovery requests despite having failed to file a rule compliant answer to the amended complaint on the promissory note, and after several warnings, Plaintiffs ultimately filed and served their fourth motion on August 28, 2017 (the "08/28/2017 Motion") which specifically sought, as a sanction, to strike the Defendants' single sentence answer and enter a default for failing to plead an answer in good faith and one that was not submitted for an improper purpose prohibited by the rules.

152.    Once again, upon the filing of the 08/28/2017 Motion, Plaintiffs were duty bound to provide proper and adequate notice to Omodunbi, which they did by sending copies of the motion papers in the same manner as before, and just as before, the "process server exemption" necessitated that the FDCPA did not apply to them during this time period that they were performing such acts.

153.    Additionally, approximately two weeks later, given the procedural posture of the contentious proceedings in the Collection Action, Plaintiffs sent a letter to the court requesting an adjournment of the return date of their motion to be heard at the same time as the Defendants' pending motion to dismiss the complaint based on an alleged failure to provide discovery, and sent a copy of that letter, together with another demand to amend or withdraw their answer, and additional copies of responsive documents that were already provided, to Hersh on September 13, 2017.

154.    Finally, after repeated demands, Defendants eventually filed an amended Answer which at least contained numbered paragraphs, although it still amounted to an abuse of process in as much as it continued the sham litigation strategy with regards to Omodunbi's fraudulent denials of having signed the promissory notes based on a claimed lack of information.

155.     Thereafter, the Collection Action proceeded to the discovery phase which consisted of yet another opportunity for Defendants to execute the design of their association-in-fact enterprise of compromising the debt that was the subject of the Collection Action by unlawful and corrupt means and through abuses and perversions of the litigation process as set forth more fully below.

### Defendants Commence Their Knowingly Frivolous FDCPA Action In Furtherance Of The Enterprise's Purpose And Serve The Plaintiffs With Their Fraudulent Papers – Violations Of 18 U.S.C. §§ 1341 & 1343

156.     Finally, in September of 2017, Defendants commenced their knowingly frivolous FDCPA action in furtherance of the association-in-fact enterprise's purpose and served the Plaintiffs with their fraudulent paperwork on or about December 13, 2017.

157.     Specifically, Defendants' initial allegations in commencing the FDCPA action contained no less than five knowingly false, malicious, and fraudulent representations as follows:

a.     Defendants alleged that Plaintiffs violated the FDCPA with their initial communication by failing to include the requisite notice of Omodunbi's verification rights. However, Defendants knew that this representation was false because, at the time, Defendants were still in possession of the original letter with the enclosure and also were still in possession of a copy of Omodunbi's October 10, 2016 letter that was sent in response thereto specifically invoking his verification rights;

b.     Defendants alleged that Plaintiffs violated the FDCPA with their initial communication and subsequent communications by demanding $14,075.40, the full amount of the debt, less collection costs, asserting that Defendants were seeking to collect excess amounts. However, Defendants knew that this representation was false because, at the time, Defendants were still in possession of a copy of Omodunbi's

November 30, 2016 letter admitting that he owed that amount. Additionally, Defendants were, at that point in time, also in possession of copies of all three promissory notes that Omodunbi signed, all of which expressly included a promise to pay for any late charges, penalties, and collection costs. And finally, Omodunbi recalled incurring the debt, however, Omodunbi and Hersh had devised a plan in furtherance of the enterprise's purpose to lie under oath by stating that Omodunbi could not recall signing the promissory notes and could not tell whether it was his signature for the purposes of prolonging the Collection Action until after the FDCPA action was filed to compromise the debt;

c.      Defendants alleged that Plaintiffs violated the FDCPA with their method of service of the four motion papers, which included sending copies of the papers to Omodunbi and to Hersh. However, aside from the fact that the FDCPA does not cover "any person while... attempting to serve legal process on any other person in connection with the judicial enforcement of any debt" Defendants knowingly and intentionally omitted the fact that Hersh specifically failed to respond to the Plaintiffs 01/27/2017 communication to Hersh, and knowingly and intentionally omitted the fact that Hersh also never objected to the Plaintiff's method of service or provided Plaintiffs with a statement indicating that Defendants would not contest the sufficiency of service of any paper that was sent to Hersh only. Just the opposite, as was later revealed by their arguments in opposing Plaintiffs first motion to enforce litigant's rights, Defendants intended to contest the adequacy of service of any document that was not also sent to Omodunbi. All of which consisted of various litigation abuses designed and executed in

furtherance of the enterprise's purpose of compromising the debt that Omodunbi knew that he owed to the Plaintiff's client, Rutgers;

      d.     Defendants alleged that Plaintiffs violated the FDCPA with several phone calls that transpired immediately prior to Hersh's retention by also devising a fraudulent and knowingly false sham in which Defendants would also claim that the Plaintiffs abused and harassed Omodunbi by trying to take advantage of him, by trying to confuse him, and by making numerous threats that they would take certain actions that they could not legally take. Additionally Defendants also alleged that as a result of these harassing and abusive communications, Omodunbi has suffered significant mental and emotional stress and harm and other injuries of that sort. Once again, however, Defendants knew that these representations were false because Defendants were already in possession of the copies of the Plaintiffs' business records containing ELB's contemporaneous notes of those conversations; Defendants knew that those conversations consisted almost entirely of negotiations; Defendants were also in possession of the January 6, 2017 Email which memorialized the time sensitive offer that the Plaintiffs had made to Omodunbi; Defendants were also aware of the fact that Omodunbi had specifically requested that the Plaintiffs terminate the litigation – Omodunbi was a sophisticated and educated consumer with a Ph.D in Economics from Binghamton University; and Defendants were also aware of the fact that Omodunbi was not suffering from any sort of emotional or mental harms or distress; and finally

      e.     Defendants also alleged that Plaintiffs violated the FDCPA with their January 20, 2017 Email in which they revoked their time sensitive offer to resolve the litigation and indicated they would be resuming their litigation efforts by again

misleading Omodunbi (who Defendants falsely characterize as a helpless and naïve

dimwit) about the fact that he had already defaulted on his obligation to answer the

original complaint. However, once again, Defendants knew that Omodunbi was a

sophisticated and educated consumer with a Ph.D in Economics from Binghamton

University; Defendants were in possession of the Plaintiff's business records of those

conversations detailing the back and forth negotiations that transpired culminating in the

January 6, 2017 time sensitive offer which included a specific offer to terminate the

litigation at Omodunbi's request; and Defendants also knew that Omodunbi was not

confused by this email because he promptly retained Hersh to file an answer before the

time to file expired.

158.    As mentioned, Plaintiffs were served with the Defendants sham litigation papers

on or about December 13, 2017.

159.    Two days later, after receiving and reviewing Defendants fraudulent filings, at

4:23 PM in an effort to avoid extraordinarily expensive and spurious litigation, Plaintiffs sent an

email to Defendants, at Hersh's email address of lh@hershlegal.com, an offer to settle the

frivolous FDCPA claims, despite their fraudulent character, on December 15, 2017.

160.    Specifically, Plaintiffs first reminded Defendants of what facts were actually

warranted by the evidence, attaching another copy of the first letter including the verification

notice, attaching account statements from Rutgers showing the late fees and penalties that were

charged, and also referencing the 01/06/2017 Email memorializing their time sensitive offer, and

reminding Hersh of the applicable "process server exemption" contained in 15 U.S.C. §

1692a(6)(D).

161.    Thereafter, Plaintiffs further stated that, knowing how time consuming and injurious the instant spurious FDCPA litigation proceedings would be, Plaintiffs specifically offered to pay Omodunbi $1,001.00, in exchange for a release of all such contested and frivolous FDCPA claims, which was one dollar more than Omodunbi would ever be able to otherwise recover, if somehow the FDCPA proceedings ultimately resulted in a finding of some technical violation of the statute.

162.    Once again, however, because of the pendency of now both actions, Plaintiffs offer was conditioned on acceptance thereof within a short time frame, otherwise Plaintiffs would have to respond to the pending FDCPA complaint and report the claim to their insurance carriers.

163.    Crucially, because the Plaintiffs offer, if accepted, would have defeated the ultimate object of the enterprise and the FDCPA lawsuit – to compromise the underlying debt – Defendants never responded to this offer of settlement, until two months later, on or about February 12, 2018, after Plaintiffs had already begun suffering injuries as a result of the frivolous FDCPA litigation, specifically demanding that the Plaintiffs settle the underlying debt that Omodunbi owed to Rutgers for $3,000.

164.    Additionally, in accordance with Hersh and Omodunbi's agreement, Hersh also demanded, on Omodunbi's behalf, $17,500 as a fee for Hersh, on account of approximately 35 hours that Hersh claims he spent performing legal services, up to that point in time, in defending in the Collection Action, albeit unsuccessfully and in bad faith.

165.    The following day however, on February 13, 2018, Plaintiffs, initially suspecting that Defendants were attempting to abuse court processes in the Collection Action for the purposes of manufacturing damages and a cognizable injury in the FDCPA action, responded to

Defendants - through defense counsel that was initially retained for them by their insurance

carrier – that any settlement demand that involves an attorney fee would need to contain an

itemized schedule of services with dates, amount of time, and description of work performed.

166.   Importantly this response was sent to Hersh once again at his email address of

lh@hershlegal.com and was sent at 11:45 AM on February 13, 2018. A true and correct copy of

this email has been attached hereto as **EXHIBIT 17**.

167.   Five and half years later, Hersh has failed to produce any schedule of services

despite repeatedly demanding that such fees are an item of damages in the FDCPA case.

***Defendants Engaged In Numerous Discovery Abuses In Both Actions Designed To Pervert
The Truth Seeking Process, Conduct That Is Prohibited By Various Authorities, In
Furtherance Of The Enterprise's Purpose Causing Further Injuries To The Plaintiffs***

168.   Subsequent to instituting their knowingly frivolous FDCPA action, Defendants

also engaged in numerous and rampant discovery abuses in both actions, violating numerous

state and federal laws, all of which was designed and executed to accomplish the enterprise's

purpose by perverting the truth seeking process and intended to perpetuate two knowingly false

narratives, simultaneously in both actions, as follows:

a.   Through their discovery abuses in the Collection Action, Defendants

sought to perpetuate the knowingly false narrative that Omodunbi, in fact, did not

actually owe a debt to Rutgers, evidenced by a signed promissory note, in furtherance of

the enterprise's purpose of compromising the debt; and

b.   Through their discovery abuses **in both actions**, the Collection Action, as

well as, the FDCPA Action, Defendants sought to perpetuate the knowingly false

narrative that the Plaintiffs engaged in abusive, harassing, deceptive, or otherwise unfair

debt collection activities causing cognizable injury to Omodunbi, in furtherance of the enterprise's purpose of compromising the debt.

169.    To begin with, as was mentioned above, during the fall of 2017, Defendants harassed the Plaintiffs with repetitive, redundant, irrelevant and unreasonably burdensome written discovery requests, for the purposes of setting up a frivolous motion to dismiss based on an alleged failure to respond to discovery, for the purposes of injuring the Plaintiffs and misleading the trial court about the Plaintiff's participation in the discovery process, and with design of furthering the enterprise's purpose of compromising the debt.

170.    More egregious, however, was the way in which the Defendants conspired to, or in the alternative, the way in which Defendant Hersh corruptly persuaded Defendant Omodunbi to, testify falsely at his deposition on May 15, 2018 that was to be used in both the Collection Action and the Federal Action. A true and correct copy of the Deposition Transcript of Omodunbi, together with the complete list of exhibits that were introduced and/or authenticated and referenced at that time has been attached hereto as **EXHIBIT 18**.

### Defendants Engaged In Numerous Acts Or Omissions During Omodunbi's Deposition Testimony On May 15, 2018 In Violation Of Various Authorities

171.    Specifically, Defendant Omodunbi sat for his deposition on May 15, 2018. Importantly, however, at this point in time, Defendants had already commenced their frivolous FDCPA action based on numerous knowingly false representations, and it was, therefore the expectation and intent of all parties that Omodunbi's deposition testimony would be used in both proceedings, the state Collection Action, as well as the then pending FDCPA action, which is an "official proceeding" as defined by 18 U.S.C. § 1515(a)(1).

172.     At this deposition, Defendants either conspired to, or in the alternative, Defendant Hersh corruptly persuaded and/or engaged in misleading conduct towards Defendant Omodunbi, with the intent of influencing and giving false testimony about the following subjects:

173.     First and foremost, despite the fact that Omodunbi was a well educated consumer with a sophisticated understanding of financial matters and, at least tangentially, certain legal matters based on his post graduate education, Defendants either conspired to, or Defendant Hersh corruptly persuaded Defendant Omodunbi to, perpetuate a simple but materially false narrative that Omodunbi was an uneducated and rather ignorant dim wit that was easily confused, mislead, and otherwise taken advantage of.

174.     Second, and of greater import, Defendants also conspired to, or Defendant Hersh corruptly persuaded Defendant Omodunbi to, perpetuate an elaborate and materially false narrative about Omodunbi's ability to recall any relevant factual details related to both the Collection Action and the FDCPA action for the purposes of executing the association-in-fact enterprise's purpose of compromising the underlying debt.

175.     Specifically, Defendants either conspired, or Hersh corruptly persuaded Omodunbi to lie by specifically advising Omodunbi that regardless of whether his statements were true, it would be impossible to prove that any claims of a failure to recall were knowingly false when stated. And, additionally, Defendants also conspired to, or Hersh corruptly persuaded Omodunbi to lie about his recollection by also explaining that as long as he claimed that he could not recall something at the time that he was asked a question at his deposition, he could still change his testimony at a later date in the event that they lost in the Collection Action and thereafter had to make an offer of proof in the federal action in order to establish their knowingly false claims in the Federal Action.

176.    In particular, this scheme to commit perjury and lie about Omodunbi's recollection of numerous facts specifically implicated the following facts that were material to either the FDCPA action, or both the Collection Action and the FDCPA action:

a.      Whether Omodunbi signed the promissory note, or recognized his signature thereon, which called for the repayment of the principal debt of $13,541.40, together with the late fees and penalties that were assessed by Rutgers upon his failure to make payments, as well as all collection costs specifically including the Plaintiffs' professional fees;

b.      Whether the Plaintiffs Initial Communication contained the requisite disclosures as required by 1692g;

c.      Whether the Plaintiffs harassed, or abused or made false threats to Omodunbi in the four phone calls that took place before Hersh became involved in the litigation;

d.      Whether Omodunbi admitted that he owed the debt and solicited a settlement offer specifically involving the termination of the pending Collection Action in January of 2017 prior to Hersh's involvement;

e.      Whether Omodunbi understood what was meant by the Plaintiff's January 20, 2017 Email in which they indicated that they would be resuming their efforts to litigate the Collection Action; and finally

f.      Whether Omodunbi had actually suffered any concrete harm or injury or any mental or emotional distress as a result of Plaintiffs contacts with him.

177.   Third, during Omodunbi's deposition, Defendants also conspired to, or Defendant Hersh corruptly persuaded Defendant Omodunbi to, withhold a document containing an undisputed copy of Omodunbi's signature for comparison to the promissory notes.

**In Response To Certain Documents That Omodunbi Was Questioned About During His Deposition Testimony, Defendants Destroyed Or Concealed Certain Documents And/Or Objects With The Intent To Impair Their Availability For Use In The FDCPA Action**

178.   Additionally, immediately after Omodunbi's deposition, specifically after Plaintiff, Daniel Berger, peppered him with questions about his alleged foggy memory, including his memory of the letters that he had received from the Plaintiffs or his copies of the ones he had written to ELB, Defendants also conspired to, or Defendant Hersh corruptly persuaded Defendant Omodunbi to, destroy or conceal the following documents and/or objects with the intent to impair their availability for use in the FDCPA action:

a.   The original letter that Plaintiff had sent Omodunbi on September 27, 2016 with the enclosure containing all of the notices required by statute;

b.   A copy of Omodunbi's letter that he wrote to G&B in October of 2016 specifically invoking his verification rights; and

c.   A copy of Omodunbi's letter that he wrote to G&B in November of 2016 in which he acknowledged the validity of the debt and offered to pay $25 per month.

179.   In the alternative, if the Defendants did not destroy or conceal the above mentioned records and/or documents immediately after Omodunbi's deposition, they did so later during the discovery phase of the FDCPA action after their initial disclosures obligation was triggered or after they were served with discovery requests.

180.   In either case, however, these actions were taken with intent to impair their availability for use in the FDCPA action.

**Defendants Also Unsuccessfully Sought To Prove That Plaintiffs soughtt To Collect Excess Amounts By Deposing Two Rutgers Representatives And When Their Testimony Proved To Be Damaging To Defendants' Case Defendants Corruptly Altered The Deposition Transcripts To Omit The Damaging Exhibits That Were Introduced And Authenticated During Testimony**

181.    Additionally, Defendants also engaged in abuse of process and certain unlawful activities on relation to their conduct during and subsequent to the depositions of two of Rutgers' representatives on May 18, 2018.

182.    Specifically, Defendants sought to prove that Plaintiffs soughtt to collect excess amounts by deposing two Rutgers representatives, John Moetz, and Rashod Jones, which took place on May 18, 2018.

183.    These actions were taken in furtherance of the enterprise's purpose of compromising the debt.

184.    Additionally, it was the intention, and the expectation of the Defendants that they would use the testimony of both Rutgers representatives and the documents introduced at that time to aid their prosecution of the then pending FDCPA claims, however, as explained in further detail below, when Defendants ultimately realized that the testimony did not help their FDCPA case, or the enterprise's purpose of compromising the debt, but instead, was damaging to their FDCPA case, and the enterprise's purpose of compromising the debt, Defendants corruptly altered the record of the deposition testimony by not including any of the exhibits.

185.    Specifically, Defendants, through Hersh, introduced and authenticated numerous documents during the depositions, specifically including the three signed promissory notes (including the Contract), the first page of Plaintiff's Initial Communication, the original and amended complaint that Plaintiff's prepared and filed in the Collection Action, and various business records of Rutgers.

186.     Thereafter, Defendants, through Hersh, proceeded to try and prove the allegations of the FDCPA complaint and when the testimony proved to be damaging, Defendants corruptly altered the deposition transcript to omit those evidentiary documents from the record. For example:

a.     Hersh introduced the first page of the Plaintiff's initial communication and attempted to question Mr. Moetz about the amounts reflected in the letter to prove Defendants' knowingly false claim that Plaintiffs soughtt to collect excess debt. Additionally, Hersh also sought to prove a claim that was ultimately not included in the sham FDCPA complaint that Plaintiffs somehow misrepresented certain facts, or acted unfairly or abusively towards Omodunbi by not seeking to recover Rutgers' attorney fees initially. However, when Mr. Moetz confirmed that the initial amount demanded of $14,075.40 was correct and corroborated exactly what Plaintiffs had stated in their motion to amend the complaint – that they initially did not seek the recovery of Rutgers' attorney fees because that is their standard practice for tuition accounts but agreed with the Plaintiffs' recommendation that they amend the complaint based on the heightened pleading requirements in the case of a signed promissory note and the likelihood of expensive and protracted litigation proceedings to seek the recovery of their attorney fees, Defendants subsequently decided to corruptly alter the record of the deposition by omitting the first letter from the transcript;

b.     Hersh also introduced the signed promissory notes, including the Contract, and attempted to question Mr.  Moetz about the language in an attempt to prove Defendants' knowingly false claim that Plaintiffs soughtt to collect excess debt. However, when Mr. Moetz confirmed that the Contract contained three paragraphs with

an express promise to repay the principal amount, "any charges accrued through interest or penalty," as well as "all collection costs... in the event Rutgers... referred the account to an attorney for collection[,]" Defendants subsequently decided to corruptly alter the record of the deposition testimony by omitting the promissory notes, including the Contract, from the transcript;

c.     Hersh also introduced several Rutgers' business records that were disclosed in discovery or brought to the deposition in accordance with deposition notice, and again attempted to question, both Mr. Moetz, and Mr. Jones, about the amounts that were charged to Omodunbi through interest or penalty over the course of several years in their attempts to obtain voluntary payments. Once again, this documents were introduced and Hersh questioned the witnesses in an attempt to prove Defendants' knowingly false claim that Plaintiffs soughtt to collect excess debt. However, once again when both Mr. Moetz and Mr. Jones confirmed that the amounts sought by Plaintiffs were correct and reflected the amounts that Rutgers assessed to Omodunbi's account through interest or penalty based on his failure to make any payments, Defendants subsequently decided to corruptly alter the record of the deposition testimony by omitting those business records from the transcript.

187.   Once again, these alterations were all done in furtherance of the enterprise's purpose of compromising the debt, and done with the intent of impairing their availability or integrity for use in the FDCPA proceeding, and also for the improper purpose of delaying and adding to the expenses of the Collection Action by falsely arguing that the evidentiary materials were never authenticated in unsuccessfully opposing Rutgers' motion for summary judgment in the Collection Action.

**Defendants Also Corruptly Concealed, Destroyed, Or Altered Numerous Documents And/Or Records For The Purposes Of Impairing Their Availability Or Integrity For Use In The FDCPA Action**

188.    Furthermore, Defendants either conspired to, or Defendant Hersh corruptly persuaded Defendant Omodunbi, or Defendants both directly, destroyed or concealed numerous documents and/or records for the purposes of impairing their availability or integrity for use in the FDCPA action. For example:

a.    Defendants destroyed, concealed or altered with the intent to impair its availability or integrity, the original September 27, 2016 letter with the enclosure that Plaintiffs sent to Omodunbi;

b.    Defendants destroyed, concealed or altered with the intent to impair their availability or integrity, original loan documents and account statements for the private Wells Fargo loan that Omodunbi obtained to pay for part of the Rutgers debt;

c.    Defendants destroyed, concealed or altered with the intent to impair their availability or integrity, Hersh's schedule of services and/or any invoices on relation to his defense on behalf of Omodunbi in the Collection Action; and

d.    Defendants destroyed, concealed or altered with the intent to impair their availability or integrity, all of the email communications exchanged between DAB and Hersh between January 27, 2017 when Hersh entered his appearance in the Collection Action and December 13, 2017 when Hersh first notified the Plaintiffs of his objections to their method of service with service of the original FDCPA complaint, as well as any copies of Hersh's business records which contained any notes or contemporaneous records of the phone calls between DAB and Hersh between that same time period.

**Defendants Also Filed And/Or Served, Utilizing The Mails And Wires, Numerous Fraudulent Papers As Part Of Their Pattern Of Sham Litigation Activities In Furtherance Of The Enterprise's Purpose In Connection With Discovery In The FDCPA Case In Violation Of 18 U.S.C. §§ 1341, 1343, & 1503(a)**

189.     Additionally, Defendants also utilized the mails and wires to file and/or serve numerous fraudulent papers in connection with discovery in the FDCPA action in furtherance of the enterprise's purpose and as part of their pattern of sham litigation activities. For example:

a.       In their initial disclosures and responses to discovery requests, Defendants fraudulently mailed and/or electronically transmitted to the Plaintiffs a list of witnesses or persons with discoverable information and knowingly and maliciously failed to identify Hersh as one such person, specifically regarding Hersh's email and phone communicationsthat he exchanged with DAB between January 27, 2017 and December 13, 2017 when Hersh first notified the Plaintiffs of Defendants' objections to their method of service;

b.       Hersh also electronically filed, on January 31, 2019 and then again on February 24, 2020, Join Discovery Plans, which, on both occasions fraudulently asserted that no confidentiality order would be necessary, while knowing that he would eventually attempt to demand Plaintiffs enter into an overly broad and unduly burdensome confidentiality agreement for the purposes of continuing to conceal his schedule of services for services performed in connection with defending in the Collection Action;

c.       Alternatively, Hersh also electronically served/filed certain answers to discovery which fraudulently claimed that records containing his schedule of services for services performed in connection with defending in the Collection Action actually existed, when in fact, they do not exist – rather Hersh intends to spend time falsifying

these records, if, and only if, Plaintiffs were to agree to a settle the FDCPA claims and Hersh is thereafter able to proceed to prepare an attorney fee petition;

d.     Defendants also electronically served certain answers to interrogatories which fraudulently asserted that Defendant Omodunbi never solicited Plaintiff's agreement on behalf of Rutgers to accept a payment arrangement of $300 per month which was memorialized by the January 6, 2017 Email;

e.     Defendants also electronically served certain answers to interrogatories which fraudulently asserted that Defendant Omodunbi was suffering from distress, anxiety, fearful, problems sleeping and concentrating and other manifestations of emotional distress that was caused by the Plaintiffs contacts; and

f.     Hersh also electronically served several letters and other filings in which he lied about never being served with the Plaintiff's requests for admissions;

g.     After successfully misleading the magistrate judge about whether Defendants were served with the requests for admissions, Defendants thereafter electronically served responses to requests for admissions which again perpetuated the fraudulent scheme regarding Omodunbi's false claims about a lack of recollection and falsely denied matters that were already adjudicated in the Collection Action; and

h.     Finally, Defendants also engaged in numerous instances of abuses, making specific misrepresentations about their intentions to actually proceed with meaningful discovery in the FDCPA case on several occasions with multiple filings, specifically for the purposes of avoiding such discovery, and also constituting violations of 18 U.S.C. § 1512(b) based on their engaging in misleading conduct towards the Plaintiffs, the magistrate judge, and the Plaintiffs prior counsel, with the intent to delay or prevent the

testimony of Omodunbi in the FDCPA action that would inevitably expose the knowingly

false nature of the underlying allegations and defeat the enterprise's goal.

***Defendants Committed Egregious Abuses Of Court Processes During Execution Proceedings On The State Court Judgment Defrauding The Superior Court Of New Jersey In The Process And Manufacturing Additional Frivolous FDCPA Claims***

190.    As noted above, Judgment was entered in the Superior Court of New Jersey in

favor of Rutgers and against Omodunbi and docketed with the Clerk of the Superior Court on

October 23, 2018 at No. J-183978-18, in the amount of $19,487.34.

191.    However, pursuant to the Association – in – fact Enterprise's purpose, that a

lawful judgment was entered against Defendant Omodunbi was of no consequence, and only

meant that Defendants would continue to employ their tactics of abusing court processes as a

means for avoiding lawful execution on the judgment while simultaneously continuing with the

prosecution of the frivolous FDCPA claims as a means for coercing a waiver/release of the

Judgment Debt.

192.    The fact that this was the purpose and design of the Association – in – fact

enterprise can be readily ascertained from the Defendants' repeated settlement demands in the

FDCPA Action, all of which included a demand to compromise the Judgment Debt:

a.    As noted above, on or about December 21, 2017, Defendants rejected the

Plaintiffs offer to settle the frivolous FDCPA claims, before any significant time and

litigation efforts had taken place, for $1,001.00 – one dollar more than the maximum

statutory damages available;

b.    As noted above, on February 12, 2018, Defendants communicated a

counter offer to the Plaintiffs, through prior counsel, demanding that Plaintiffs pay the

Defendant Omodunbi $1,000 in statutory damages, pay Defendant Hersh, $17,500 in attorney fees, and finally, settle the Rutgers debt for $3,000;

      c.    Again, in December of 2018, after Judgment had been entered, Defendants continued to demand that any settlement of the FDCPA action include a waiver of the Judgment Debt; and

      d.    Again, at another settlement conference on February 14, 2020, Defendants again demanded by way of settlement, "$15,000 in actual damages, [Judgment] debt waiver, and $108,669.76 in attorney's fees and costs."

193.    Subsequent to entry and docketing of the Judgment Debt, Plaintiffs proceeded to take lawful steps to enforce the judgment.

194.    Although Plaintiffs previous methods of effectuating service included attempts to send the relevant documents to Omodunbi, personally, out of concerns that merely providing same to Hersh may be inadequate, after Defendants commenced the instant frivolous FDCPA action, effectively notifying the Plaintiffs, for the first time, of their objections to the Plaintiffs method of service, all further proceedings in the Collection Action that required Plaintiffs serve Omodunbi were attempted by exclusively sending the relevant documents to Hersh.

195.    Particularly, despite the sham nature of the FDCPA action and the knowingly false nature of its allegations, Plaintiffs still had obligations to Rutgers and as officers of the court and therefore in their lawful and reasonable attempts at effectuating post judgment remedies in connection with the judicial enforcement of the debt, Plaintiffs necessarily complied with Hersh's representations that they needed to communicate exclusively through Hersh.

196.    In fact, in response to Plaintiff's standard Interrogatories in the FDCPA Action which asked for Omodunbi to state each address where he has lived in the past five years,

Defendants responded to these requests by refusing to provide Omodunbi's current address and stating that "[c]urrently, [Omodunbi] is living out of state. However, because of [Plaintiffs'] previous attempts to contact and harass [Omodunbi]... contact should be made... through" Hersh and then provided only Hersh's Office address.

197.    Pursuant to NJ Court Rules, however, once a judgment has been entered and the time for an appeal has expired, both courts and judgment – creditors have certain rights appurtenant to the entry of judgment including the right to compel the judgment – debtor to answer questions that would assist the judgment – creditor in enforcing that judgment, including: (i) full name; (ii) current address; (iii) confidential personal identifiers; (iv) telephone number; (v) full name and address of current employer as well as weekly salary; (vi) any other judgment creditors; (vii) name, address and account numbers of all bank accounts on which the judgment – debtors name appears; (viii) name and address of any other sources of non-exempt income together with the amount and frequency of such income; (ix) identifying information about any real estate or other assets that the judgment – debtor may own or have an interest in; (x) identifying information about any non-exempt personal property; (xi) identifying information about any business interests; and (xii) a certification in lieu of an affidavit that the answers are complete and true together with the judgment – debtors signature.

198.    On October 24, 2018, Plaintiffs served Defendant Omodunbi with one such Information Subpoena that required that he answer by providing all of the above information, by sending it to Hersh via certified and regular mail, return receipt requested.

199.    Hersh received the information subpoena and signed for the certified mail containing the Information Subpoena on November 5, 2018.

200.    Pursuant to NJ Court Rules, Omodunbi was required to answer the Information Subpoena within 14 days thereafter, on or about November 19, 2018.

201.    However, rather than comply, Omodunbi simply ignored the Information Subpoena, or alternatively, Defendant Hersh corruptly persuaded Omodunbi not to answer, or corruptly destroyed and/or concealed the Information Subpoena from Omdunbi altogether.

202.    In the latter case, however, in obstructing the proper and lawful enforcement of a valid judgment, Defendant Hersh corruptly influenced, obstructed, and impeded the due administration of justice in violation of 18 U.S.C. § 1503(a).

203.    Thereafter, upon confirming that the Information Subpoena was properly served on Hersh, Plaintiffs drafted and filed a motion to enforce litigant's rights, which if granted, would, in effect, operate as an order to compel Defendant Omodunbi to submit answers to the Information Subpoena.

204.    Importantly, the state process for enforcing a judgment is designed to preserve the proper administration of justice, since judgments without an enforcement mechanism would be meaningless.

205.    One such method of enforcing a judgment is the process of post judgment discovery which is designed to provide a judgment – creditor with information about any and all assets of the judgment – debtor that may be attached or levied against and sold or liquidated in order to satisfy the money judgment.

206.    More importantly, the enforcement mechanism for ensuring compliance with post judgment discovery ultimately involves the restraint on the judgment – debtor's liberty with the possibility of an issuance of an arrest warrant.

207.    Given the high stakes of the interests involved, the NJ process for ensuring a judgment – debtor is guaranteed his due process protections, requires that  a creditor's attorney provide not just one, not just two, but three robust attempts at effectuating service:

    a.    Initially with the Information Subpoena, the creditor's attorney is required to effectuate service thereof, and then wait 14 days before taking additional steps;

    b.    Second, the creditor's attorney is required to seek, first, an order enforcing litigant's rights by way of a motion, that he is again required to provide adequate notice of via proper service; and

    c.    Finally, the creditor's attorney must also serve a copy of the order enforcing litigant's rights and only after 10 days from the certified date of service of the order, can he apply for an arrest warrant.

208.    Additionally, at each and every step of this process, the creditor's attorney is also required to personally verify the adequacy of service by conducting an appropriate inquiry into the facts and circumstances surrounding the attempts to effectuate service and make a showing sufficient for the court to find that the judgment – debtor is guilty of a willful violation of a court order.

209.    In the case at bar, subsequent to Plaintiffs' filing and proper service of the motion to enforce litigant's rights, Hersh engaged in conduct so deceitful and egregious, that it truly shocks the conscious.

210.    Specifically, despite previously arguing in the FDCPA action that Plaintiffs violated the FDCPA by serving Omodunbi directly, Hersh argued that the original Information Subpoena and the Motion to Enforce Litigant's Rights were not properly served because they were served on Hersh and not on Omodunbi directly.

211.    Even more shocking, however, were Hersh's false and malicious representations to the New Jersey Superior Court that he was no longer representing Omodunbi with respect to the Collection Action – again this lie came in the same week that Hersh, for the third or fourth time, demanded that Plaintiffs waive the Judgment Debt as part of their settlement of the FDCPA Action.

212.    However, more problematic was the manner in which Hersh's flagrant abuses and intentional obstruction of the due administration of justice prejudiced Plaintiffs' ability to ensure Omodunbi's due process rights were protected.

213.    Specifically, despite the NJ Superior Court rejecting his frivolous argument that service of the Information Subpoena and the Motion to Enforce Litigant's Rights was defective because it was provided only to Hersh and not to Omodunbi directly, during several phone conversations in January when Plaintiffs pressed Hersh to confirm whether or not he had personally provided the Court Order and the Information Subpoena to his client, Defendant Omodunbi, and advised him that if he failed to do so, he could face the severe consequences of being arrested for contempt of court, Hersh, instead, avoided the question, intentionally obstructing Plaintiffs' efforts to ensure Omodunbi's due process rights were protected and impeding the due administration of justice, and berated Plaintiff over the phone, while also insisting that Plaintiffs continue to discuss compromising the underlying Judgment Debt.

214.    Consequently, as a direct result of Hersh's brazen abuses of court processes and willful disregard and utter contempt for the due and administration of justice, specifically as it related to his refusal to acknowledge whether or not he was actually providing adequate notice to his own client, Plaintiffs had to petition the New Jersey Superior Court for a special hearing to have the Court compel Hersh provide adequate assurances that he was notifying his own client,

Omodunbi of the Court's order to compel and the commensurate risks of the restraint on his liberty for continued failure.

215.    However, by the time this hearing was held on January 23, 2019, Omodunbi had already moved out of the State of New Jersey, specifically for the purposes of continuing to avoid execution on the Judgment Debt and to further the goal of the association – in – fact enterprise and, unbeknownst to the Plaintiffs, beyond the reach of the New Jersey Superior Court or the State's jurisdiction.

216.    Consequently, at the January 23, 2019 hearing, Hersh again repeated the lies about not representing Omodunbi with respect to the Judgment Debt and tricked the Court into believing that the only suitable remedy to the Plaintiffs inability to ensure Omodunbi's due process rights were protected was to instruct the Plaintiffs to contact Omodunbi directly.

217.    This instruction from the New Jersey Superior Court, however, that Plaintiffs had to contact Omodunbi directly, was precisely the result of Defendants' deliberate and malicious sham that Hersh and Omodunbi had terminated their agency relationship. However, this was done, precisely for the purposes of furthering the enterprise's purpose, particularly because Defendants both knew that Omodunbi had already moved out of state and therefore beyond the reach of the New Jersey Superior Court, and that any efforts to compel answers to the Information Subpoena would be fruitless, and in particular, there was no risk that Omodunbi could be arrested.

218.    However, unaware and specifically mislead by Hersh's fraudulent representations at the January 23, 2019 hearing, Plaintiffs sent Omodunbi an email with the Court's prior order compelling his answers and the Information Subpoena and notified him of the risk that an order for his arrest could issue for his continued failure to answer.

219.    Thereafter, Hersh and Omodunbi discussed and conspired to have Omodunbi, instead, send the Plaintiffs a separate email ignoring the subject of the Information Subpoena and the Order to compel entirely, and demanding that Plaintiffs provide him with updated figures on the amount of the judgment, together with a settlement offer to compromise the Judgment Debt.

220.    Unaware that Omodunbi was already beyond the reach of the New Jersey Superior Courts, and specifically, concerned that Omodunbi did not understand the severity of his continued failure to comply with the Information Subpoena, and specifically intending to ascertain whether his failure to do so was knowing or unknowing, Plaintiff attempted to call Omodunbi on a number that they had in their file, however, when no one answered and the voicemail machine did not identify Omodunbi as the owner of the phone, Plaintiff merely identified himself as Dan Berger, indicated he was trying to reach Omodunbi and asked for a return call.

221.    The following day, on January 31, 2019, Omodunbi again sent an email to the Plaintiffs, ignoring any mention of the Information Subpoena and the Court's order and again repeating their demands for an updated judgment balance and another settlement offer to compromise the Judgment Debt.

222.    Plaintiffs ultimately responded to Omodunbi's requests shortly thereafter, providing him with a copy of the docketed writ of execution that had an updated judgment balance as of the day it was filed, but indicated that no offer of settlement would be made until Plaintiffs and Rutgers were apprised of his ability to satisfy the Judgment Debt with proper answers to the Information Subpoena.

223.     Finally, several days later, Plaintiffs learned that Omodunbi was no longer residing in the state of New Jersey and had to temporarily abandon their efforts to execute on the Judgment Debt.

224.     Thereafter, having first suspected the instant malfeasance, Plaintiffs wrote a letter to the district judge of the FDCPA Action specifically, dated February 6, 2019, intending to seek specific emergent relief to allow Plaintiffs the opportunity to assert certain counterclaims and third party claims against Omodunbi and Hersh in the FDCPA action based on the on-going sham litigation under numerous theories.

225.     However, the district judge never entertained, or even acknowledged this request, and instead, a few days later, Plaintiffs prior counsel in the sham FDCPA Litigation filed a motion to withdraw based on their inability to competently defend against the frivolous claims and the case was stayed with no activity for four months.

***Defendants Double Down On Their Knowingly Frivolous FDCPA Claims In Furtherance Of The Enterprise's Purpose And Serve The Plaintiffs With Their Fraudulent Papers – Violations Of 18 U.S.C. §§ 1341 & 1343***

226.     Subsequently, in a desperate attempt to avoid revealing the true nature of their sham litigation tactics as a means of delaying and preventing the lawful collection of the underlying Judgment Debt, Defendants doubled – down on their knowingly frivolous FDCPA claims in furtherance of the enterprise's purpose and on or about February 6, 2020 filed and served the Plaintiffs with their fraudulent parperwork.

227.     Specifically, Defendants' allegations in its Second Amended Complaint filed in the FDCPA Action contained no less than five knowingly false, malicious, and fraudulent representations as follows:

a.      Defendants alleged that Plaintiffs violated the FDCPA with their initial communication by failing to include the requisite notice of Omodunbi's verification rights. However, Defendants knew that this representation was false because, at the time, Defendants had already destroyed the original letter with the enclosure as well any copies of Omodunbi's October 10, 2016 letter that was sent in response thereto specifically invoking his verification rights, specifically for the purposes of impairing it's availability for use in the proceedings and for perpetuating the sham litigation;

b.      Defendants alleged that Plaintiffs violated the FDCPA with their initial communication and subsequent communications by demanding $14,075.40, the full amount of the debt, less collection costs, asserting that Defendants were seeking to collect excess amounts. However, Defendants knew that this representation was false because, at the time, of filing the second amended complaint, those issues had already been adjudicated in the Collection Action and it was already conclusively established that Omodunbi owed those amounts and filing the within amended complaint was specifically for the purposes of attempting to re-litigate what he already lost, and in order to perpetuate the sham litigation proceedings;

c.      Defendants alleged that Plaintiffs violated the FDCPA with their method of service of the four motion papers, which included sending copies of the papers to Omodunbi and to Hersh. However, aside from the fact that the FDCPA does not cover "any person while... attempting to serve legal process on any other person in connection with the judicial enforcement of any debt" Defendants knowingly and intentionally omitted the fact that Hersh specifically failed to respond to the Plaintiffs 01/27/2017 communication to Hersh, and knowingly and intentionally omitted the fact that Hersh

also never objected to the Plaintiff's method of service or provided Plaintiffs with a statement indicating that Defendants would not contest the sufficiency of service of any paper that was sent to Hersh only. Just the opposite, as was later revealed by their arguments in opposing Plaintiffs first motion to enforce litigant's rights, Defendants intended to contest the adequacy of service of any document that was not also sent to Omodunbi. All of which consisted of various litigation abuses designed and executed in furtherance of the enterprise's purpose of compromising the debt that Omodunbi knew that he owed to the Plaintiff's client, Rutgers;

      d.    Defendants alleged that Plaintiffs violated the FDCPA with several phone calls that transpired immediately prior to Hersh's retention by also devising a fraudulent and knowingly false sham in which Defendants would also claim that the Plaintiffs abused and harassed Omodunbi by trying to take advantage of him, by trying to confuse him, and by making numerous threats that they would take certain actions that they could not legally take. Additionally Defendants also alleged that as a result of these harassing and abusive communications, Omodunbi has suffered significant mental and emotional stress and harm and other injuries of that sort. Once again, however, Defendants knew that these representations were false because Defendants were already in possession of the copies of the Plaintiffs' business records containing ELB's contemporaneous notes of those conversations; Defendants knew that those conversations consisted almost entirely of negotiations; Defendants were also in possession of the January 6, 2017 Email which memorialized the time sensitive offer that the Plaintiffs had made to Omodunbi; Defendants were also aware of the fact that Omodunbi had specifically requested that the Plaintiffs terminate the litigation – Omodunbi was a sophisticated and educated consumer

with a Ph.D in Economics from Binghamton University; and Defendants were also aware of the fact that Omodunbi was not suffering from any sort of emotional or mental harms or distress; and finally

    e.    Defendants alleged that Plaintiffs violated the FDCPA with their January 23, 2019 Email, January 30, 2019 Voicemail, and January 31, 2019 Email, which were in three manufactured claims directly and proximately caused by Hersh's knowing and intentional obstruction of the proper administration of justice with post judgment discovery in the Collection Action, and his commission of a fraud on the New Jersey Court by falsely representing that he had terminated his agency relationship with Omodunbi with specific intent of causing Plaintiffs to have to directly contact Omodunbi in order to ensure that he was provided with adequate notice of the Court's January 11, 2019 Order compelling him to answer the Information Subpoena.

***Defendants Again Violate 18 U.S.C. §§ 1341 & 1343 When Transmitting Their Papers On Summary Judgment – Submitting Perjured Testimony About The Original September 27, 2016 Collection Letter And Raising New Claims Alleging That Plaintiff's Violated The FDCPA By Not Demanding Attorney Fees In Their Initial Demand***

    228.    In September of 2022, the FDCPA Action finally arrived a the summary judgment phase, with both parties submitting motions for summary judgment, which were eventually consolidated and filed in bundled format and as a result, on December 27, 2022, Defendants submitted three more filings electronically, including a motion for summary judgment, an opposition to Plaintiffs' motion for summary judgment and reply in support of Omodunbi's motion for summary judgment.

    229.    However, upon the transmission of their Summary Judgment motion via the wires and the mails, Defendants again committed mail and wire fraud, with the transmission of

Omodunbi's perjured testimony, and additionally, have further violated 18 U.S.C. § 1512 by conspiring to submit false testimony in an official proceeding.

230.    Specifically, when Defendants eventually realized the significant problems with their claims of FDCPA violations regarding the notice of verification rights contained in the first letter based on Omodunbi having actually exercised those rights in his letter of October 10, 2016, Defendants conspired to submit perjured testimony in a Declaration in which Omodunbi stated that "[o]n or about October 13, 2016, I sent a letter to [Gordin & Berger] seeking verification of the Debt, after finding out from a friend that I had a right to do so." A true and correct copy of this sham affidavit has been attached hereto as **EXHIBIT 19**.

231.    This statement, however, is perjured testimony as Omodunbi had already testified in the Collection Action that he believed that he wrote this October 2016 Letter requesting verification of the Debt "right after [he] got a letter in the mail from Edward Berger."

232.    Additionally, Defendants also committed mail and wire fraud, with the transmission of their papers that now claimed that, after Omodunbi had already submitted responses to interrogatories that claimed the opposite, that Plaintiffs violated the FDCPA by not initially demanding to recover their attorney fees.

233.    Further, Defendants have, and continue to, abuse court processes, with their filings on summary judgment. Specifically, for nearly four years, Defendants claimed, albeit frivolously, that the Plaintiffs violated the FDCPA by seeking to collect excess debt, and subsequent to amendment, by seeking to collect attorney fees on behalf of Rutgers, which they were not entitled to collect.

234.    As noted above, the full amount of the debt was ultimately adjudicated as having been due and owing, and the amended request for attorney fees ultimately withstood the exacting

standard that is required to establish fee-shifting when the NJ Superior Court awarded attorney fees upon a finding the language of the promissory notes clearly evidenced an intent to include fee-shifting in the event that Rutgers had to refer the account to attorneys for collection.

235.    Thereafter, as mentioned above, upon realizing that their initial theory would not be successful, Defendants, at the 11th hour, on summary judgment and well after the pleadings had closed, flip flopped in their claims for violations stemming from the various letters and initial complaint by arguing that, the Plaintiffs violated the FDCPA because they **did not** initially seek the recovery of their attorney fees in their demand letters, further asserting that they violated the FDCPA by failing to show a breakdown of the charges that Plaintiff's had initially argued were excessive.

236.    As a consequence, Plaintiffs, through counsel raised all of these issues to the NJ District Court in their bulk summary judgment filings.

237.    And in addition, Plaintiffs also sought leave to again add counterclaims and third party claims in that action, at which point the Court clarified that no final judgment or order had been rendered as to any matters in the NJ District Court case, and thereafter scheduled a case management conference that took place on January 26, 2023.

238.    At this case management conference the Magistrate Judge asked for clarity regarding the parties' respective positions and indicated that all decisions with respect to all of the pending motions and requests, save for the request from the Plaintiffs for permission to file a sur-reply brief on relation to the summary judgment motions, were before the District Judge.

239.    Thereafter, on March 30, 2023, NJ District Court case was administratively terminated with no adjudication on the merits as to any claims that were before the Court or could have been brought therein having been rendered.

240.     Accordingly, Plaintiffs now bring this action pursuant to 15 U.S.C. § 1692k(d) and 28 U.S.C. § 2201for declaratory and injunctive finding that Plaintiffs did not violate any provision of the FDCPA and are NVDC's, enjoining the Defendants from further prosecution of such, and also seeking damages under § 1692k(a)(3) for each claim in the NJ District Court Action that Defendants demonstrably brought in bad faith.

241.     Further, Plaintiffs also bring claims for damages under the 18 U.S.C. § 1962, based on the same conduct that amounted to Racketeering Activity, and further Plaintiffs also bring pendent state law claims for abuse of process and slander of title.

## SPECIAL DAMAGES

242.     As a direct and proximate result of the acts and omissions described herein, constituting actionable conduct under various common law theories as well as statutory violations, Plaintiffs have suffered numerous injuries in the aforesaid forms including special damages as further described.

243.     Plaintiffs have suffered pecuniary and economic injuries in the form of substantial interference with their business by diverting their efforts from profitable matters consuming significant amounts of limited time and resources, including time away from business development and long term business systems maintenance and updates, all of which has cost Plaintiffs significant sums, and moreover, such interference with their business was not only foreseeable, but was the specific design of the within described acts and omissions to cause such interruption and disturbance to their business to apply coercive pressure on Plaintiffs, as attorneys for Rutgers in the Collection Action and defendants in the NJ District Court Action for improper purposes as described in further detail herein.

244.    Additionally, Plaintiffs have suffered further pecuniary losses in the form of out of pocket costs and expenses incurred, both as a result of continuing to defend in the NJ District Court Action as well as in having to incur substantial, unreimbursed expenses during the prosecution of the Collection Action. Moreover, the incurring of these compounding expenses and out of pocket costs was not only foreseeable, but was the specific design of the within described acts and omissions.

245.    Further Plaintiffs have suffered additional pecuniary and economic losses in the form of increased malpractice insurance premiums as a direct result of the compounding litigation expenses and protracted nature of NJ District Action and Collection Action proceedings.

246.    Further Plaintiffs' injuries stemming from the interference with their business has been compounded by Defendants' numerous attempts to compromise the judgment in the Collection Action in order to settle the NJ District Court Action by creating a conflict of interest between Plaintiffs and their Insurance Carrier, resulting in further interference with their business in order to manage the tripartite relationship, and having to retain separate coverage counsel to handle the internal disputes between Plaintiffs and their Insurance Carrier.

247.    Additionally Plaintiffs have also suffered significant injuries to their professional reputations as a result of the protracted and expensive nature of the NJ District Court Action proceedings. Furthermore, as a direct result of the above described conduct Plaintiffs have also lost business, and have suffered pecuniary and economic injuries in the form of their lost fees for their professional services in the underlying Collection Action.

248.    Finally, as a result of the constant and sustained interference with their business, and overwhelming financial pressure as a result of the expensive and protracted nature of the NJ

District Action proceedings, Plaintiffs have further suffered emotional and mental injuries, including but not limited to: stress, anxiety, loss of sleep, strain on DAB and ELB's father-son relationship, and other intangible injuries.

### COUNT ONE – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
#### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

249.    Pursuant to 28 U.S.C. §§ 1331, 1738, and 2201, and 15 U.S.C. §§ 1692e and 1692f, Plaintiffs seek a declaration from this Court that they did not violate the FDCPA with any of their filings in the Collection Action which sought the recovery of penalties and attorney fees that were expressly authorized by agreement creating the debt.

250.    Furthermore, Plaintiffs also seek appropriate equitable relief to enjoin all Defendants and their agents from prosecuting a claim such alleged violation in any other forum, including the NJ District Action, and from taking any further steps on relation thereto.

251.    Finally Plaintiffs also seek an a award of damages pursuant 15 U.S.C. § 1692k(a)(3) where it is clear that Defendants brought and have continued the prosecution of this claim in bad faith and primary for improper purposes.

252.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

253.    Accordingly, pursuant to 28 U.S.C. §§ 1331, 1738, and 2201, and 15 U.S.C. §§ 1692e and 1692f, G&B seeks a declaration from this Court that none of their demands for $14,075.40 were violations of either §§ 1692e or 1692f because those amounts were actually owed, and they did not contain any misrepresentations, and those issues were already litigated in the Collection Action and decided against the Defendants in an adjudication on the merits, which is subject to full and faith and credit, and Defendants are prohibited from re-litigating those issues.

254.     Additionally, with respect to the Plaintiff's subsequent filings on behalf of Rutgers, which also sought damages for collection costs equal to forty percent (40%) of the outstanding debt, G&B further seeks a declaration from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. §§ 1692e and 1692f that none of their filings or requests were violations of either §§ 1692e or 1692f as follows:

255.     With regards to § 1692f(1), G&B is entitled to a declaration that they did not violate this provision because: (1) recovery of their professional fees was expressly authorized by the agreement creating the debt; and (2) recovery of their professional fees was not prohibited by state law because Chapter 10, Subchapter 6 of Title 9A of the New Jersey Administrative Code (including N.J.A.C. § 9A:10-6.16) had no applicability to the underlying debt.

256.     Additionally, with regards to § 1692e(2)(B) which forbids a debt collector from falsely representing "any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt," G&B is also entitled to a declaration that they did not violate this provision because: (1) they accurately represented the amount of their professional fees as 40% of the debt; (2) the agreement creating the debt specifically obligated Omodunbi to pay for "all" of G&B's professional fees; and (3) there was no legal authority preventing G&B from receiving their full professional fees of 40% of the amounts collected, irrespective of any discretionary reduction in attorney fee award.

257.     Furthermore, it is clear that Omodunbi is bringing these claims in bad faith and for the purposes of harassment because each of the issues raised was, in fact, already decided against him in the underlying Collection Action, and yet, he brings these claims again, now, in bad faith, and solely for the purposes of harassment, to needlessly increase G&B's litigation costs and for coercion.

258.    The first set of issues raised by this claim, whether or not Omodunbi signed the

02/04/2010 Promissory Note – the agreement creating the debt – and whether its terms called for

the payment of late fees, interest/penalty and attorney fees/collection costs, were (1) "identical"

to the issues that were "previously adjudicated[;]" (2) "actually litigated; (3)... necessary to the"

orders granting the motion for summary judgment and denying Omodunbi's cross-motion for

partial summary judgment; and (4) Omodunbi "was fully represented in the prior action."

259.    Accordingly, there is simply no alternative explanation beyond a malicious

attempt to re-litigate the same issues in a more consumer friendly forum under the guise of a

claim for violations of federal law in order to prevent enforcement and collection of the

underlying debt that was reduced to judgment, and to harass G&B and increase their litigation

costs.

260.    Moreover, the issue of whether G&B's professional fee for its efforts to collect on

Omodunbi's account was 40% was also (1) previously adjudicated, (2) actually litigated, and (3)

necessary for the decision in the action in which Omodunbi was (4) fully represented.

261.    Specifically, Omodunbi did instruct Hersh to demand information about G&B's

contingency fee agreement with Rutgers during the State Collection Action which was included

in one of his discovery demands.

262.    G&B thereafter produced for Omodunbi's inspection the relevant part of their

contingency fee agreement during the discovery phase on April 20, 2018 in an email to Hersh.

263.    A true and correct copy of that email, together with the relevant page of G&B's

contingency fee agreement, has been attached hereto as **EXHIBIT 20**.

264.    Thereafter, on April 25, 2018, G&B also advised Omodunbi, through Hersh, that

if he wished to see the remaining portions of the agreement that were unrelated to the litigation,

since the agreement was a matter of public record, he could make an appropriate request under New Jersey's applicable Open Public Records Act.

265.    A true and correct copy of this 04/25/2018 Email has been attached hereto as **EXHIBIT 21**.

266.    Further, Omodunbi also instructed Hersh to depose two of Rutgers' employees and specifically asked them, as well, under oath, about what G&B's professional fee was in order to collect on Omodunbi's debt, and again, both also testified, under oath, on May 18, 2018 that G&B's professional fee was a contingency fee of forty percent (40%).

267.    During John Moetz's deposition, he confirmed that G&B's professional fee is paid on a contingency basis pursuant to their fee agreement that was "executed... [a]pproximately five years" prior when Rutgers did its "Requests For Proposal" (RFP) as part of the "[p]rocurement process for public institutions" and that G&B was entitled to "[f]orty percent of the entire balance" collected.

268.    Similarly, during Rashod Jones' deposition, he also confirmed that G&B's professional fee, as well as other firms, have "different rates based on the contracts" as part of the RFP's bidding process, and further, that the rates vary based on "[t]he placement" but that Omodunbi's case was a "second placement legal" and that the applicable contingency fee rate was 40 percent.

269.    Finally, despite having been provided with adequate proofs, Omodunbi eventually obtained a copy of G&B's entire contingency fee agreement on or about June 25, 2018 pursuant to an official request for records that was made by Hersh pursuant to New Jersey's Open Public Records Act.

270.     On or about April 19, 2018, at Omodunbi's instructions, Hersh filed a request for information pursuant to New Jersey's Open Public Records Act ("OPRA Request").

271.     Thereafter, this request was eventually forwarded to Elizabeth Minott, Esquire ("Minott") an attorney in Rutgers' Office of General Counsel.

272.     Thereafter, Minott and Hersh, pursuant to Omodunbi's instructions, spoke about the OPRA Request which sought the production of copies of the retainer agreements for all of Rutgers' collection attorneys.

273.     When Minott contacted the individuals in Rutgers' collections departments that would have had custody of the agreements, they ultimately brought this inquiry to G&B's attention as the Omodunbi matter was fresh in their minds, having recently been deposed, and in order to speed up the process, G&B specifically forwarded a complete copy of the entire agreement (**EXHIBIT 1**) to Minott on June 25, 2018, who thereafter sent it to Hersh in compliance with the OPRA Request, on that same day, **which was more than a year prior** to filing the motion to amend the complaint in the FDCPA litigation, and eighteen months prior to filing the second amended complaint.

274.     Thus, it is clear that in bringing this particular claim, which again disputes the fact that G&B's professional fee was a contingency fee of 40%, in spite of all of the above mentioned litigation activities, Omodunbi is bringing it in bad faith, and for the purposes of harassment, and to increase G&B's litigation costs, and in order to coerce a compromise on the debt that was already reduced to judgment.

275.     Similarly, this particular adjudicated fact that G&B's fee was a contingency fee of 40% was necessary for the decision that was entered in the State Court action, since as was explained by the trial court during the summary judgment motion hearing, and as was argued by

Omodunbi in his cross-motion for partial summary judgment, the amount of G&B's contractual fee was a completely separate and discreet factual issue from the separate equitable issue committed only to the trial judge's discretion of whether an award of 40% for G&B's contingent attorney fee was reasonable.

276.    Specifically, as the trial court recited in its opinion granting the motion for summary judgment, with regards to the request for collection costs, there were three discreet issues that needed to be ascertained: (1) as used in the promissory note, "what does the term collection costs mean[;]" (2) "does that include" a forty percent "contingent legal fee[;]" and (3) "is that [amount] reasonable." See **EXHIBIT 3**.

277.    Similarly, as was argued in Omodunbi's opposition brief to Rutgers' motion for summary judgment in the state case:

> "A party seeking contractual fees has the burden of proving their reasonableness. Green v. Morgan Properties, 73 A.3d 478, 492 (N.J. 2013). In the present case, [Rutgers] has failed to prove that the 40 percent contingent fee is reasonable. As such, Plaintiff's summary judgment motion must be denied."

278.    Thus, the reduction in the judgment award attributable to Rutgers' collection costs/attorney fees, had nothing to do with what either the promissory note or G&B's contingency agreement called for, but rather, was entirely predicated on the court's discretion to make a determination of what amount of attorney's fees would be reasonable, which it determined would be limited to $4,207.34, which was 30% percent of the total of the principal, late fees, and Interest/Penalty.

279.    At the same time, as set forth above, it is clear that the trial court's reliance on the 30 percent cap on attorney fees in the case of NJCLASS Loans as set forth in N.J.A.C. 9A:10-

6.16(b) was merely used as the grounds for the trial court's determination of "reasonableness" in lieu of the factors set forth in N.J. RPC 1.5(a).

280.    Obviously the cited provisions of the New Jersey Administrative Code would not operate as a legal bar to either G&B's ability to contract with Rutgers for a 40% contingency fee in Omodunbi's case, or to Rutgers' ability to seek recovery of that amount in the Collection Proceedings, because, as noted above, the underlying debt was not a NJCLASS Loan.

281.    More importantly, however, it is clear that Omodunbi is again liable for prosecuting this claim in bad faith and for the purposes of harassment because Omodunbi knows and admitted to this fact – that the particular debt that was the subject of the Collection Action was not a NJCLASS Loan – during the state court proceedings.

282.    Specifically, on September 4, 2018, Omodunbi submitted a sworn statement in lieu of an affidavit in accordance with NJ Court rules in opposition to Rutgers' motion for summary judgment in the Collection Action.

283.    A true and correct copy of this sworn statement has been attached hereto as **EXHIBIT 22**.

284.    As seen therein, Omodunbi specifically stated in paragraph six (6) thereof:

> "Since I was not a U.S. citizen, I did not qualify for any of the governmental student loan programs. However in February 2010, I was able to obtain a student loan directly from Wells Fargo which I used to pay off part of the amount of the tuition that was owed for the first semester. I am still making monthly payments on that Wells Fargo loan."

See, **EXHIBIT 22** at ¶6.

285.    To reiterate what was stated above, the NJ CLASS Loan program is a specific state loan program administered by the New Jersey Higher Education Student Assistance Authority.

286.    Omodunbi, applied for and/or attempted to obtain a NJ CLASS Loan, along with other "governmental" student loans, however, as noted, because he was not a U.S. Citizen he did not qualify for such loans.

287.    Accordingly, in subsequently advancing and continuing to prosecute this particular claim **predicated on the knowingly false allegation** that the underlying debt was a NJ CLASS Loan and subject to specific state regulations that G&B violated when they sought to collect their contractual attorney fees that exceeded this state prescribed thirty percent cap, Omodunbi is again liable for violating 15 U.S.C § 1692k(a)(3).

288.    As further evidence of his bad faith and malicious and unlawful conduct, Omodunbi was served with Requests for Admissions in September of 2019 in the FDCPA litigation, which specifically sought admissions to these factual issues:

289.    In Plaintiffs' Request For Admissions No. 15, Plaintiff sought an admission from Omodunbi that "[Plaintiffs] have a contract with Rutgers... that calls for contingency fees in the amount of 40% on non-Perkins loans that are placed in litigation, which is their professional attorney fee."

290.    A true and correct copy of Omodunbi's responses to the requests for admissions containing the original requests that were made, that were completed and sent via mail on or about October 9, 2020, has been attached hereto as **EXHIBIT 23**.

291.    Thereafter, Omodunbi and Hersh discussed this particular request and Hersh, being the scrupulous attorney that he is, advised Omodunbi that having done the extensive discovery that they did in the state case, including requesting a full copy of G&B's agreement through the OPRA Request, they would need to admit to this particular request.

292.     However, Omodunbi was adamant that they should not admit, and as result, they put the requests for admissions aside and by the time they returned to them over a year later on October 9, 2020, Hersh had forgotten all of the discovery that had been conducted and, at Omodunbi's instructions, responded to this request for admission by stating that "[a]fter making a reasonable inquiry, [Omodunbi] lacks knowledge or information to either admit or deny [the] Request since the information [Omodunbi] knows or can readily obtain is insufficient to enable [him] to admit or deny." See **EXHIBIT 23**

293.     In Plaintiffs' Request For Admissions No. 16, Plaintiffs sought an admission from Omodunbi that "[t]he reduction of the contingency fee award pursuant to the Order entering summary judgment reducing the amount from 40% to 30% was in spite of the fact that the contract expressly authorized." See **EXHIBIT 23**

294.     Once again, Omodunbi and Hersh discussed this particular request and Hersh, being the scrupulous attorney that he is, advised Omodunbi that having done the extensive discovery that they did in the state case, including requesting a full copy of G&B's agreement through the OPRA Request, combined with the fact that the State Court had already concluded that he signed the 02/04/2010 Promissory Note which expressly authorized fee-shifting after Omodunbi's deposition, they would need to admit to this particular request.

295.     Once again, however, Omodunbi was adamant that they should not admit it, and as a result, they put the requests for admissions aside and by the time they returned to them over a year later on October 9, 2020, Hersh had forgotten all of the discovery that had been conducted and, at Omodunbi's instructions, responded to this request for admission by stating that "[a]fter making a reasonable inquiry, [Omodunbi] lacks knowledge or information to either admit or deny [the] Request since the information [Omodunbi] knows or can readily obtain is insufficient

to enable [him] to admit or deny. Without waving the objections, [Omodunbi] denies the Request." See **EXHIBIT 23**

296.    In Plaintiffs' Request For Admissions No. 17, Plaintiffs soughtt an admission from Omodunbi that "[t]he reduction of the contingency fee award pursuant to the Order entering summary judgment, reducing the amount from 40% to 30% was specifically because the Court found that the statute governing 'NJClass Loans' caps the allowable contingency fees to 30% of the outstanding principle, interest, and late fees." See **EXHIBIT 23**

297.    Thereafter, Omodunbi and Hersh discussed this particular request as well and Hersh, being the scrupulous attorney that he is, advised Omodunbi that having done the extensive discovery that they did in the state case, including requesting a full copy of G&B's agreement through the OPRA Request, and having familiarity with that particular loan program ever since Omodunbi learned that he did not qualify for such "governmental" student loans, they would need to admit to this particular request.

298.    But once again, Omodunbi was adamant that they should not admit it, and as a result, they put the requests for admissions aside and by the time they returned to them over a year later on October 9, 2020, Hersh had forgotten all of the discovery that had been conducted and, at Omodunbi's instructions, responded to this request for admission by stating that "[a]fter making a reasonable inquiry, [Omodunbi] lacks knowledge or information to either admit or deny [the] Request since the information [Omodunbi] knows or can readily obtain is insufficient to enable [him] to admit or deny. Without waving the objections, [Omodunbi] denies the Request." See **EXHIBIT 23**

299.    In Plaintiffs' Request For Admissions No. 18, Plaintiffs sought an admission from Omodunbi that "[t]he loan that was the subject of [his] debt was not a 'NJClass Loan.'" See **EXHIBIT 23**

300.    Hersh and Omodunbi did discuss this particular request as well, and again, being the scrupulous attorney that he is, Hersh advised Omodunbi that they would have to admit to this request since Omodunbi was familiar with the NJClass Loan Program ever since he learned that he did not qualify for the loan program when he applied in 2010.

301.    Again Omodunbi was adamant that they should not admit it, and as a result, they put the requests for admissions aside and by the time they returned to them over a year later on October 9, 2020, Hersh had forgotten all about these matters, and at Omodunbi's instructions, responded to this request for admission by stating that "after making a reasonable inquiry, [Omodunbi] lacks knowledge or information to either admit or deny [the] Request since the information [Omodunbi] knows or can readily obtain is insufficient to enable [him] to admit or deny. Without waving the objections, [Omodunbi] denies the Request." See **EXHIBIT 23**

302.    Similarly, in Plaintiffs' Request For Admissions No. 20, they sought an admission from Omodunbi that G&B "has not collected any amounts from [Omodunbi] and [Omodunbi] has not paid any money to [G&B] in relation to the underlying debt." See **EXHIBIT 23**

303.    Once again, Hersh and Omodunbi discussed this matter, and Hersh specifically asked Omodunbi if he had paid anything to G&B and in response, Omodunbi stated that he could not recall, although at the time, Omodunbi knew that he had not paid G&B a single penny.

304.    Thereafter, when Hersh and Omodunbi returned to the requests a year later on October 9, 2020, Hersh again asked Omodunbi about whether he had paid G&B any money and Omodunbi knowingly lied to Hersh stating that G&B had collected money from him and that he

had, in fact, paid G&B money, and thereafter, Hersh denied this request when completing the responses.

305.    Accordingly, where Omodunbi's rampant and numerous instances of instructing Hersh to falsify information contained in his responses to requests for admissions in the FDCPA litigation for the purposes of continuing to prosecute this particular claim based on Omodunbi's knowingly false statements is clearly a violation of 15 U.S.C § 1692k(a)(3), and where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's conduct, G&B requests an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  and such other relief as may be available under the law or in equity.

306.    Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

## COUNT TWO – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

307.    Pursuant to 28 U.S.C. §§ 1331 and 2201, and 15 U.S.C. § 1692, Plaintiffs seek a declaration from this Court that they did not violate the FDCPA with their September 27, 2016 initial communication with Omodunbi where their initial communication provided Omodunbi with adequate notice of his statutory rights and their initial communication was neither inconsistent with, nor overshadowed Omodunbi's statutory rights.

308.    Furthermore, Plaintiffs also seek appropriate equitable relief to enjoin all Defendants and their agents from prosecuting a claim for this alleged violation in any other forum, including the NJ District Action, and from taking any further steps on relation thereto.

309.    Finally Plaintiffs also seek an a award of damages pursuant 15 U.S.C. § 1692k(a)(3) where it is clear that Defendants brought and have continued the prosecution of this claim in bad faith and primary for improper purposes.

310.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

311.    As seen in **EXHIBIT 5**, the actual Initial Communication contained all of the information that is required by statute and did not overshadow Omodunbi's rights.

312.    That the Plaintiff's initial communication contained adequate notice of all of Omodunbi's verification rights and did not overshadow them is further evidenced by Omodunbi's response letter specifically invoking his verification rights as seen in **EXHIBIT 6**.

313.    Further, as seen in **EXHIBIT 18**, Omodunbi has already testified under oath, that he "remembered writing... at least one... letter... **right after** [he] got a letter in the mail from" ELB and that after looking at the letter attached hereto as **EXHIBIT 6**, which was entered as "Exhibit A-2" at the deposition, he stated that he believed that letter to be the one he wrote "right after" getting a letter in the mail from the Plaintiffs.

314.    Despite giving this testimony in May of 2018, Defendants have continued to prosecute this claim in bad faith through the following acts and/or omissions:

        a.    First, by concealing the original copy of G&B's initial communication for nearly four years despite having been served with requests for production that specifically

required that they produce the original for copying and inspection, and only producing

the same in a reply brief in support of their summary judgment motion;

b.     Second, by destroying the second page enclosure that came with it for the

specific purposes of impairing its availability for use in the NJ District Court Action; and

c.     Finally, by conspiring to offer false testimony and submitting a sham

affidavit in which, in direct contradiction to his prior testimony, Omodunbi asserts that he

wrote his response letter invoking his verification rights "after finding out from a fried

that [he] had a right to do so." See **EXHIBIT 19**.

315.    Further, Defendants also never identified any "friends" after being served with

interrogatories requiring them to identity the names, addresses, and contact information for all

persons with knowledge of relevant information.

316.    Accordingly, Plaintiffs request an order and decree from this Court pursuant to 28

U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692g that their Initial Communication was

not a violation of the federal law, and further seek any appropriate equitable relief to enjoin all

Defendants, and their agents, from prosecuting a claim for this violation and from taking any

further steps on relation thereto.

317.    Further, where G&B has suffered, and continues to suffer ongoing harm and

injuries as a direct result of Omodunbi's bad faith prosecution of this claim for purposes of

harassment, G&B requests an award of actual and special damages pursuant to 15 U.S.C §

1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  and

such other relief as may be available under the law or in equity.

318.    Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's

directions or legal advice in connection with the wrongful, malicious and bad faith continuation

of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C §

1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against

all Defendants jointly and severally, and such other relief as may be available under the law or in

equity.

### COUNT THREE – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
#### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

319.    Pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692e, G&B

seeks a declaration from this Court that they did not violate the FDCPA with respect to the Four

Phone calls that took place between October 2016 and January of 2017 where G&B never

threatened to take any action that they had no legal right to take, or that they did not intend to

take.

320.    Furthermore, Plaintiffs also seek appropriate equitable relief to enjoin all

Defendants and their agents from prosecuting a claim for this alleged violation in any other

forum, including the currently pending NJ District Action, and from taking any further steps on

relation thereto.

321.    Plaintiffs incorporate by reference the allegations set forth above as though the

same were set forth at length herein.

322.    As seen above, those four conversations, consisted entirely of settlement

negotiations between G&B and Omodunbi that were contemporaneously recorded by Edward L.

Berger, Esquire in G&B's compute file and at no point did G&B ever threaten any action nor did

they make any statements that were deceptive or could be construed as confusing and they are

entitled to a declaration as such.

323.    Additionally, prior to the taking of his deposition testimony in the Collection

Action on May 15, 2018, Omodunbi had not given much thought to those four phone

conversations specifically where they consisted entirely of settlement negotiations between Omodunbi and Edward Berger and also contained numerous admissions regarding the legitimacy of the underlying debt which were statements against his own interests and therefore were of minimal importance to him.

324.    Thereafter, at his deposition, when Omodunbi was finally questioned about those phone calls, he testified under oath that he did not remember the contents of any of those phone calls beyond that they were about the Collection Action and the underlying debt.

325.    Moreover, when he was asked if he remembered how he reacted when he was told by G&B during one of the phone calls that he owed Rutgers money, he further stated that he also did not remember how reacted.

326.    Subsequent to his deposition, Hersh did suggest to Omodunbi that they should amend their FDCPA complaint to withdraw these claim for violations based on the Four Phone Calls, however, Omodunbi insisted that they should not and insisted, in bad faith, that they keep the claim in for the purposes of harassment.

327.    Thereafter, Defendants have continued to prosecute this claim in bad faith further submitting additional sham affidavits, amounting to another incident of wire fraud, as well as the submission of false testimony in an official proceeding in violation 1512(c).

328.    As was summarized in the Plaintiffs reply brief papers in support of their summary judgment motion in the NJ District action, which was never ruled on and instead terminated without being decided:

329.    In paragraphs 14 and 15 of Omodunbi's Declaration, Omodunbi states that "[b]ased upon conversations with Edward Berger[,]"he was "fearful" that ELB "would contact [his] employer... garnish [his] wages" even before "judgment was entered" and that he could

"possibly lose his job" as result, and that because of these alleged threats made during these phone conversations, Plaintiff "was very stressed and concerned[,]" "had trouble sleeping." and that it even "affected [his] eating habits." See, **EXHIBIT 19** at ¶14.

330.    Further, Omodunbi stated that as a result of these threats and the resulting stress, he "frequently had headaches thinking about the issue" and that his "concentration at work was negatively affected, and [he] was less productive as a result of the stress." See, **EXHIBIT 19** at ¶ 15.

331.    Omodunbi submitted these sworn statements in an attempt to support his claims that Plaintiffs abused and deceived Omdunbi during four telephone conversations and that he has suffered significant emotional distress as a result of those phone calls with Edward Berger between October of 2016 and January 2017.

332.    However, in Omodunbi's deposition testimony in the Collection Action, he testified about those four phone calls, and first stated that he "didn't remember" how he "felt" after those phone conversations, and then later stated that he felt "great" and has felt "great" since he "was born." As seen in the deposition transcript beginning at 63:21:

Q:    So then all of the phone calls with Ed Berger were before you talked to Larry, correct?
A:    I think so, yeah.
Q:    And you said you spoke multiple times, but you don't remember how many times?
A:    Correct.
Q:    And what do you remember about those phone calls?
A:    I mean I think he was telling me about this case, you know.
Q:    Okay. Do you remember what he told you?
A:    I mean he said I owed Rutgers money.
Q:    Do you remember how you reacted when he told you that?
A:    I don't remember.
Q:    You don't remember how you reacted... [after] any of these conversations you don't remember how you reacted?
A:    I mean I know I was confused, I think I need clarity and then I got a lawyer...
Q:    Were you upset?

A:     I don't remember my emotion back then...
Q:     What about now? How do you feel now?
A:     I feel great...
Q:     How about two months ago, did you feel great two months ago?
A:     I'm a very positive person, I always try to feel good.
Q:     How about a year ago?
A:     For my entire life I always try to maintain a very positive mood.
Q:     Okay. **But have you been experiencing any negative emotions related to this case?**
       (Hersh Objects based on relevance)
Q:     Do you remember how you felt?
A:     I don't remember.
Q:     You don't remember. I thought you just a moment ago said you felt great?
A:     Right now I feel great...
Q:     [W]hen did these feelings of feeling great start?
A:     When I was born...
Q:     So you've never been upset in your life?
A:     I was last year... [when] my dad passed... [t]hat was very sad.

See, **EXHIBIT 18** at 63:21 – 66:24 (cleaned up).

333.     As seen above, not only did Plaintiff testify that he did not really remember how he reacted or any of his emotions back then, but he further testified that he has always felt "great," the only thing he recalled about how he reacted from those telephone conversations was that he "was confused" and "need[ed] clarity" so he "got a lawyer."

334.     Additionally, in numerous paragraphs of Omodunbi's Declaration, he further states that during the phone calls with Edward Berger, he threatened to garnish Omdunbi's wages before judgment was entered and further stated that Plaintiffs' January 20, 2017 Email reinforced those false threats by misrepresenting that if Omodunbi did not make an immediate payment, Plaintiffs would "immediately begin garnishing [his] wages. *See*, e.g. **EXHIBIT 19** at ¶¶ 14-15, 20, 22.

335.     Omodunbi also alleges that Plaintiffs threatened to take his tax refund. Omodunbi Decl. at ¶ 25. Specifically, he submitted these sworn statements in an attempt to support his claims that Plaintiffs abused and deceived Omodunbi during four telephone conversations by

making false threats by threatening to take an action that they had no legal right to take and also alleging that Plaintiffs acted abusively towards him.

336.    However, Omodunbi already testified at his deposition that he did not recall the contents of those phone calls, but only recalled the tone. He later testified only that he had a vague recollection of ELB using the words "judgment" and "garnishment." **EXHIBIT 18** at 133:3-133:10.

337.    But also claimed that he did not really know what those words meant since he was "not an expert at American Law" and then finally testified that his understanding of "garnishment" had to do with attaching his "bank accounts" See, **EXHIBIT 18** at 68:2-68:4; 164:5-164:6.

338.    Thus, Omodunbi's Declaration precisely identifying the words spoken by Edward Berger directly contradicts his testimony. As he said, "I remember the tone and, you know, the threats, but I don't remember all of the contents." **EXHIBIT 18** at 132:21-132:22.

339.    Omodunbi repeated on numerous occasions during his deposition that he couldn't recall the substance of the conversations between he and Edward Berger. Finally, towards the end of his deposition, on the tenth occasion that he was asked about what he remembered from those phone conversations, his best answer was that he could vaguely recall that Edward Berger used the words "garnishment," further testifying that he thought it had to do with his bank accounts. See, **EXHIBIT 18** at 164:5-164:6.

340.    Finally, Omodunbi further admitted during his deposition that it was possible that the notes from ELB of those four phone calls accurately reflect their conversations because he could not recall the contents of their conversations.

341.     Accordingly, his Declaration in which he subsequently recalls with prefect clarity that ELB threatened to garnish his wages prior to the entry of a judgment against, is a further example of the fraudulent nature of the nature declaration, submitted in of the prohibition against wire fraud, and also amounting to false testimony in an official proceeding in violation of 18 U.S.C. § 1512.

342.     Accordingly, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692e that none of the four phone calls between October 13, 2016 and January 6, 2017 involved communications in violation of federal law, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

343.     Additionally, where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's bad faith prosecution of this claim for purposes of harassment, G&B requests an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  and such other relief as may be available under the law or in equity.

344.     Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

### COUNT FOUR – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
#### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

345.    Pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692e, G&B seeks a declaration from this Court that they did not violate the FDCPA with respect to the 01/20/2017 Email where G&B never threatened to take any action that they had no legal right to take.

346.    Furthermore, Plaintiffs also seek appropriate equitable relief to enjoin all Defendants and their agents from prosecuting a claim for this alleged violation in any other forum, including the currently pending NJ District Action, and from taking any further steps on relation thereto.

347.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein and as seen above, this email was not a violation of any provision of the FDCPA.

348.    As set forth above, G&B's 1/20/2017 Email merely communicated that were revoking their time sensitive offer that was made via the 1/6/2017 Email, and notifying Omodunbi that they would be resuming their litigation efforts.

349.    Moreover, even if Omodunbi were to have interpreted the 1/20/2017 Email to have meant that Omodunbi was already out of time to file an answer to the state court complaint and default had been entered(which he didn't), despite never using the phrase "default" or implying that Omodunbi had defaulted, this would be a "bizarre" or "idiosyncratic" interpretation of the Plaintiffs' communication that precludes a violation under 1692e.

350.    More importantly, Omodunbi actually knew precisely what was meant by the Plaintiffs' email – that because they had not yet received the first installment, G&B was effectively revoking their time-sensitive offer of settlement, and that they would be resuming their efforts to litigate.

351.     In fact, as evidenced by his retention of Hersh and timely filing of an answer to the complaint before any default was entered in the Collection Action, Omodunbi was not confused or mislead by G&B's 01/20/2017 Email but nevertheless instructed Hersh to include that particular claim as another allegation of FDCPA violations  in bad faith and for the purposes of harassment.

352.     Accordingly, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692e that the instant email did not violate federal law, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

353.     Additionally, where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's bad faith prosecution of this claim for purposes of harassment, G&B requests an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  and such other relief as may be available under the law or in equity.

354.     Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

### COUNT FIVE – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
#### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

355.     Pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692a(6)(D), G&B seeks a declaration from this Court that they did not violate the FDCPA with respect to their attempts at service of four motions on Omodunbi in the Collection Action because the FDCPA specifically excludes "any person while... attempting to serve legal process on any other person in connection with the judicial enforcement of any debt."

356.     Furthermore, Plaintiffs also seek appropriate equitable relief to enjoin all Defendants and their agents from prosecuting a claim for this alleged violation in any other forum, including the currently pending NJ District Action, and from taking any further steps on relation thereto.

357.     Finally, where the Defendants knowingly omit material facts that would undermine an element that is essential to its claim of a statutory violation of 1692c(a)(2), Plaintiffs seek damages for the bad faith prosecution of this FDCPA claim as well.

358.     Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein and as seen above, Plaintiffs were not covered by the FDCPA "while" they were attempting to serve the four instant motions.

359.     Thus, where G&B was not acting as a "debt collector... while... attempting to serve legal process" of the four motions filed in the Collection Action, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 15 U.S.C. § 1692a(6)(D) that they could not have violated federal law while attempting service because the specific federal law did not apply to them during those four specified periods of time that they were attempting service of the motions, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

360.     Further, pursuant to 15 U.S.C. § 1692c(a)(2), direct communication with a consumer known to be represented by an attorney with respect to such debt is only a violation if:

a.     the attorney has not "fail[ed] to respond within a reasonable period of time to a communication from the debt collector[;]" and

b.     the attorney has not "consent[ed] to direct communication with the consumer."

361.     Thus, put another way, having an attorney that has not failed to respond to such communication within a reasonable time, and having an attorney that has not consented to such direct communication with the consumer, are conditions precedent to bringing a claim for a violation 15 U.S.C. § 1692c(a)(2).

362.     With regards to the 03/07/2017 motion, it is clear that Omodunbi is bringing this claim and continuing to litigate it in bad faith and for the purposes of harassment because Omodunbi knows that thirty-nine (39) days prior to serving that motion, G&B sent a communication only to Hersh on January 27, 2017 via email which contained copies of all three promissory notes that Omodunbi had signed, notified them that if an amicable settlement was not reached, they would be seeking to amend their complaint to add the instant claim for attorney fees based on the notes, and sought a response in furtherance of those settlement discussions. See **EXHIBIT 12**.

363.     Furthermore, Omodunbi also knew, because he specifically instructed Hersh not to respond to that email, that Hersh did not respond within a reasonable time to that communication.

364.     Thereafter, when Omodunbi and Hersh later discussed their options for preparing their FDCPA complaint in this action, Omodunbi specifically instructed Hersh to omit those

facts from the Complaint, and both Amended Complaints, in bad faith and for the purposes of harassment, in violation of 15 U.S.C § 1692k(a)(3).

365.    Similarly, with regards to the 03/21/2017 motion, it is clear that Omodunbi is bringing this claim and continuing to litigate it in bad faith and for the purposes of harassment because after G&B served the prior motion on Hersh and Omodunbi simultaneously, Hersh and Omodunbi had a conversation in which Hersh stated that he wanted to notify G&B that they shouldn't be serving motion paperwork on Omodunbi directly and that service on Hersh would be sufficient, and Omodunbi specifically told Hersh that he shouldn't do that.

366.    Also during that conversation they discussed settlement parameters and decided that Hersh would make an offer, on Omodunbi's behalf, to settle the underlying debt for $3,500.00.

367.    In fact, Omodunbi specifically instructed Hersh not to voice their objections to G&B's method of service because he knew that G&B would think they had Hersh's consent to send motion papers to Omodunbi directly and they could then omit those facts from their FDCPA complaint in the hopes of obtaining a quick settlement and specifically to coerce a settlement on the underlying debt.

368.    Accordingly, when Omodunbi and Hersh later discussed the contents of the proposed FDCPA Complaint, Omodunbi specifically instructed Hersh to omit those facts from the Complaint, and both Amended Complaints, in bad faith and for the purposes of harassment, in violation of 15 U.S.C § 1692k(a)(3).

369.    Similarly, with regards to the 04/24/2017 motion, it is clear that Omodunbi is bringing this claim and continuing to litigate it in bad faith and for the purposes of harassment because after G&B served their second motion on Hersh and Omodunbi simultaneously, Hersh

again discussed this matter with Omodunbi and reiterated that he wanted to notify G&B that they shouldn't be serving motion paperwork on Omodunbi directly and that service on Hersh would be sufficient, and Omodunbi again refused .

370.    Thereafter, on April 20, 2017 when the 03/21/2017 Motion was granted, Hersh again suggested that Omodunbi allow him to raise their objections to G&B's method of service so that they did not think they had Hersh's consent but Omodunbi again refused, and later that day, in an email that Hersh sent to G&B at 4:36 PM, Hersh again, in accordance with Omodunbi's instructions, refrained from mentioning in that email that G&B did not have his consent to serve motion papers directly on Omodunbi. See **EXHIBIT 15**.

371.    Again, Omodunbi specifically instructed Hersh not to voice their objections to G&B's method of service because he knew that G&B would think they had Hersh's consent to send motion papers to Omodunbi directly and they could then omit those facts from their FDCPA complaint in the hopes of obtaining a quick settlement and specifically so that they could coerce a settlement of the underlying debt.

372.    Accordingly, when Omodunbi and Hersh later discussed the contents of the proposed FDCPA Complaint, Omodunbi also instructed Hersh to omit these facts from the Complaint, and both Amended Complaints, in bad faith and for the purposes of harassment, in violation of 15 U.S.C § 1692k(a)(3).

373.    Finally, with regards to the 08/28/2017 motion, it is clear that Omodunbi is bringing this claim and continuing to litigate it in bad faith and for the purposes of harassment because after G&B served their third motion on Hersh and Omodunbi simultaneously, Hersh again discussed this matter with Omodunbi and reiterated that he wanted to notify G&B that they

shouldn't be serving motion paperwork on Omodunbi directly and that service on Hersh would be sufficient, and Omodunbi, for a third time, refused.

374.    Again, this refusal was in furtherance of the same strategy, even though Omodunbi knew that these FDCPA claims were frivolous, he instructed Hersh to craft the complaint as a single count but with numerous alternative theories, and to omit the aforementioned facts from the pleadings because the purpose of the FDCPA litigation was not to actually redress any injuries based on G&B's conduct in alleged violation of the federal law, but rather, it was done as a tactic to coerce a steep discount on the underlying debt in the Collection Action.

375.    Accordingly, when Hersh communicated with G&B on six (6) occasions prior to their service of the 08/28/2017 motion,[3] each and every occasion Hersh specifically refrained, at Omodunbi's instructions, from voicing their objections to G&B's method of service precisely so that they would continue to mistakenly believe that they had Hersh's consent, and then to thereafter omit those facts from the FDCPA Complaint that was eventually filed with the expectation that G&B would pressure Rutgers into compromising the underlying debt in order to avoid the expense of defending the FDCPA action.

376.    Thus, when Omodunbi and Hersh later discussed the contents of the proposed FDCPA Complaint, Omodunbi specifically instructed Hersh to omit those facts from the Complaint, and both Amended Complaints, in bad faith and for the purposes of harassment, in violation of 15 U.S.C § 1692k(a)(3).

377.    As further evidence of Omodunbi's bad faith and improper motives in violation of 15 U.S.C § 1692k(a)(3), subsequent to the commencement of the FDCPA litigation and after

---

[3] Those six occasions were: (1) on May 12, 2017, (2) and (3) on May 18, 2017, (4) and (5) on June 27, 2017, and (6) on July 19, 2017.

G&B was served with the summons and complaint in December of 2017, G&B specifically offered to settle the FDCPA claims for one thousand and one dollars ($1,001.00) in order to avoid the additional expenses of protracted litigation.

378.    Importantly, although G&B knew that the claims were frivolous, it specifically offered to pay Omodunbi one dollar more than what he would have otherwise been able to recover in order to avoid expensive and protracted litigation.

379.    Thereafter, when Hersh passed along this offer to Omodunbi in accordance with his ethical obligations, Omodunbi rejected it because the actual purpose of filing his frivolous FDCPA claims was to coerce a compromise on the debt that he owed Rutgers that was the subject of the Collection Action.

380.    Thereafter, Hersh, at Omodunbi's instructions never responded to this offer, and G&B had to incur significant expenses when they put their insurance carrier on notice of the claims, who retained prior counsel to defend them.

381.    Hersh subsequently obtained an automatic extension to respond to G&B's initial motion to dismiss that was filed on January 17, 2018 in the FDCPA litigation, and on February 12, 2018 Omodunbi finally made a settlement demand:

382.    Specifically, on February 12, 2018, Omodunbi through Hersh, again demanded that G&B settle the underlying Collection Action for $3,000, as this was the primary objective for bringing the FDCPA case to begin with and then demanded $1,000 in damages and also requested amounts attributable to Hersh's fee based on his claimed rates of $500 per hour.

383.    Eight days later, when a response to the motion to dismiss was due, rather than file an opposition to the motion, Omodunbi instructed Hersh to prepare and file an Amended Complaint which once again alleged the same frivolous claims, in bad faith, and for the purposes

of harassment and coercion and specifically omitted all of the above facts as they relate to the claims for violations based on 15 U.S.C. § 1692c(a)(2), omitting the fact that Hersh had initially failed to respond to G&B's 01/27/2017 Email within a reasonable period of time and further omitting the fact that Hersh also refrained from raising objections to G&B's method of service on numerous occasions prior to serving the subsequent three motions.

384.   Again, all of this was done in bad faith and for purposes of harassment in violations of 15 U.S.C § 1692k(a)(3).

385.   Finally, if there was any doubt as to the evil and bad faith motives of Defendants in bringing these claims stemming from G&B's method of service of four motions directly on Omodunbi, Omodunbi's subsequent actions would remove any doubt that may still be lingering.

386.   Specifically, eighteen (18) months later, after judgment was entered against Omodunbi in the Collection Action for $19,487.34 on summary judgment, G&B served an information subpoena on Hersh in accordance with NJ Court Rules regarding discovery in aid of execution in order to enforce the judgment that had since been entered.

387.   Notably, despite previously taking the position that G&B had violated the FDCPA by serving him with the four motions directly while he was represented by Hersh, Omodunbi subsequently instructed Hersh to argue the exact opposite position in order to evade discovery in aid of execution, when Hersh argued, at Omodunbi's instructions that because G&B had served the Information Subpoena and subsequent motion to enforce litigant's rights on Hersh, rather than on Omodunbi directly, the court should deny their motion based on defective service – claiming that G&B was required to serve the Information Subpoena and motion to enforce litigant's rights directly on Omodunbi.

388.     Accordingly, where it is clear that Omodunbi has brought the instant claims in bad faith and for purposes of harassment and coercion, and where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's conduct, G&B requests an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  and such other relief as may be available under the law or in equity.

389.     Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

### COUNT SIX – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
#### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

390.     Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

391.     Pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692e(11), G&B seeks a declaration from this Court that they did not violate the FDCPA with their service of the 08/28/2017 Motion to Strike which did not include a statement indicating that they were debt collectors because §1692e(11) specifically excludes G&B's motion paperwork from that requirement.

392.     Pursuant to 15 U.S.C. § 1692e(11), a debt collector is required to indicate on any communication with the consumer that they are debt collectors attempting to collect a debt, and the failure to include that statement would, ordinarily be a violation of § 1692e(11).

393.    However, § 1692e(11) specifically states that this requirement "shall not apply to a formal pleading made in connection with a legal action."

394.    Moreover, a request to a court for specified relief that is filed in a legal action that must be made by formal motion, subject to court rules, with notice to an opposing party, is necessarily the kind of "formal pleading made in connection with a legal action" that is exempt from § 1692e(11)'s disclosure requirements.

395.    In the present case, G&B requests an appropriate order and decree that they did not violate federal law because § 1692e(11)'s requirement to include a statement that G&B is a debt collector attempting to collect a debt did not apply to their 08/28/2017 Motion to Strike.

396.    Thus, where G&B was not required to include a statement that they were debt collectors attempting to collect a debt in their 08/28/2017 motion papers, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 15 U.S.C. § 1692e(11) that they could not have violated federal law, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

397.    Further where the Plaintiffs have suffered and continue to suffer ongoing harm and injuries as a direct result of the Defendants' continued prosecution of this claim primarily for the purposes of harassment, Plaintiffs also request an award of damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

**COUNT SEVEN – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k**
**(PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)**

398.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

399.    Additionally, pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692e(11), G&B seeks a declaration from this Court that they did not violate the FDCPA with their 09/13/2017 letter to the Hersh Defendants, because § 1692e(11)'s requirements only apply to communications "with the consumer[,]" and Hersh is not a "consumer" as defined by the Act.

400.    In fact, even if the expansive definition of a "consumer" as contained in § 1692c(d), which extends to the consumer's spouse, legal guardian, executor or administrator were to apply, Hersh would still not qualify as "a consumer" to the extent that he is not the "natural person obligated or allegedly obligated to pay any debt," but rather the attorney and agent of the person with the obligation to pay a debt.

401.    Accordingly, as seen in the 09/13/2017 letters to Hersh, true and correct copies of which have been attached hereto as **EXHIBIT 24**, this communication was not "with the consumer" and accordingly G&B was not required to disclose in their communications with Hersh that they were debt collectors.

402.    Thus, where G&B was not required to include a statement that they were debt collectors attempting to collect a debt in their 09/13/2017 letters to Hersh, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 15 U.S.C. § 1692e(11) that they could not have violated federal law and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

403.    Additionally, Plaintiffs further seek an award of damages pursuant to 15 U.S.C § 1692k(a)(3) where Defendants have prosecuted this claim in bad faith as well.

404.     Specifically, it is clear that Omodunbi is bringing these claims in bad faith and for the purposes of harassment because he failed to attach the 09/13/2017 letters to Hersh as an exhibit to his Second Amended Complaint, or any prior version, as the letters themselves would establish that the provisions of § 1692e(11) do not apply because they only apply to communications "with the consumer." See **EXHIBIT 24**.

405.     In fact, Omodunbi and Hersh specifically discussed this allegation and Hersh advised Omodunbi that they should remove this particular claim since the 09/13/2017 letters were not communications with Omodunbi but they were only communications with Hersh.

406.     Thereafter, Omodunbi refused and specifically instructed Hersh to leave this particular allegation in, and further instructed Hersh that he should not attach the letters, in order to mislead the Court about who the 09/13/2017 communication was with.

407.     Specifically as a result of Omodunbi's instructions, and further due to the extensive amount of time that had passed between discussing the merits of the proposed allegations and the filing of same, Hersh re-alleged that G&B had violated § 1692e(11) by failing to disclose in their 09/13/2017 letters to Hersh that they were debt collectors and also omitted copies thereof as exhibits to the Second Amended Complaint specifically for the purposes of harassment and to needlessly increase G&B's litigation expenses, and in order to coerce a compromise of the underlying debt.

408.     Accordingly, where Omodunbi's repeated instances of instructing Hersh to falsify and omit information for the purposes of continuing to prosecute this particular claim is clearly a violation of 15 U.S.C § 1692k(a)(3), and where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's conduct, G&B requests an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous

Pennsylvania Common Law and/or applicable statutes  and such other relief as may be available under the law or in equity.

409.    Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

### COUNT EIGHT – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
#### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

410.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

411.    Pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692e, G&B seeks a declaration from this Court that they did not violate the FDCPA with their January 23, 2019 email to Omodunbi providing him with a copy of the Information Subpoena and the trial court's January 11, 2019 Order since they never threatened to take any action that could not legally be taken or that they did not intend to take. A true and correct of this January 23, 2019 Email has been attached hereto as **EXHIBIT 25**.

412.    Specifically, G&B never threatened Omodunbi with any action that they did not intend to take, nor did they threaten imminent action.

413.    Just the opposite, G&B specifically indicated to Omodunbi their reluctance to pursue an arrest warrant on numerous occasions and made exhaustive attempts to compel his answers to an information subpoena **without** resorting to his arrest.

414.    As was set forth in G&B's January 22, 2019 filing, a copy of which should have been provided to Omodunbi through Hersh, G&B specifically wished to avoid resorting to an application for Omodunbi's arrest, when they asked for Court intervention, "in an attempt to have the Information Subpoena answered without issuing an arrest warrant."

415.    A true and correct copy of this 01/22/2019 Filing has been attached hereto as **EXHIBIT 26**.

416.    As seen therein, G&B served Omodunbi with the 01/11/2019 Order Enforcing Litigant's rights on the same day it was issued, and subsequently Daniel Berger "personally followed up with... Hersh via email, asking when [G&B] would get responses in an effort to avoid having to resort to the extreme measures of requesting a warrant for... [Omodunbi's] arrest."

417.    Thereafter, G&B sent Hersh numerous emails in further attempts to obtain answers to the Information Subpoena without resort to such extreme measures.

418.    Attached hereto as **EXHIBIT 27** are true and correct copies of these email exchanges with Hersh on January 17, 2019 through January 22, 2019 in which G&B sought Hersh's cooperation in obtaining his client's compliance with an explicit court order once again for the specific purpose of avoiding seeking an arrest warrant.

419.    The following day the Court granted G&B's request for a conference which was held that afternoon, which again sought court intervention in order to **avoid having to resort** to the issuance of an arrest warrant in order to compel answers to the Information Subpoena.

420.    At this conference, G&B specifically requested that the court hold Hersh personally responsible for ensuring Omodunbi complied with its 01/11/2019 Order based on his special relationship and position of trust and confidence with his client Omodunbi, but the Court

ultimately did the opposite and, relying on Hersh's false representations about the termination of his attorney – client relationship with Omodunbi, it ultimately instructed G&B to resume communicating with Omodunbi directly.

421.    Immediately thereafter, G&B sent the instant 01/23/2019 Email to Omodunbi in which it again reiterated their intentions to only utilize an application for an arrest warrant as a last resort, and further explained that despite their legal right to pursue an arrest warrant, they would delay same specifically in light of Hersh's apparent neglect.

422.    Finally, on January 30, 2019, when G&B had yet to receive answers, in a final effort to convey their reluctance to have to resort to applying for an arrest warrant, G&B attempted to contact Omodunbi by telephone to ascertain his reasons for failing to comply with the court order.

423.    Accordingly, there was nothing false or misleading about G&B's 01/23/2019 email specifically because they were candid with Omodunbi the entire time, indicating that their intentions were **to avoid resorting to an arrest warrant**.

424.    Thus, where G&B never threatened to do something that they did not intend to do and specifically never threatened imminent action, and just the opposite was clear the entire time that they wished to avoid resorting to an application for an arrest warrant, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 15 U.S.C. § 1692e that they could not have violated federal law, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

425.     Moreover, where it is also clear that the Defendants have brought and are prosecuting this claim in bad faith and for the purposes of harassment, Plaintiffs also request damages pursuant to 15 U.S.C § 1692k(a)(3).

426.     Specifically, on October 24, 2018, G&B served an Information Subpoena and attached questions in accordance with New Jersey Court Rules for purposes of discovering Omodunbi's assets in order to execute on the judgment that was previously entered in favor of Rutgers in the Collection Action.

427.     The Information Subpoena was served on Omodunbi by certified and regular mail on Hersh only, in light of Omodunbi's previous claims that G&B had violated Omodunbi's statutory rights under the FDCPA by attempting to serve documents and filings on him directly.

428.     Thereafter Omodunbi refused to comply and instructed his attorney to ignore any further efforts to conduct discovery in aid of execution.

429.     Subsequently on December 20, 2018, G&B prepared an appropriate motion to enforce litigants' rights in accordance with N.J. Rule. 6:7-2(e) and again served the motion by sending it via certified and regular mail only to Hersh for the same reasons as before – because he had previously claimed that G&B violated his statutory rights under the FDCPA by attempting to serve documents and filings on him directly.

430.     Thereafter, in an extraordinary display of actual malice and bad faith, despite being in actual receipt of the Information Subpoena and the 12/20/2018 Motion to Enforce Litigant's Rights, Omodunbi instructed Hersh to oppose that motion on the basis of defective service, this time taking the exact opposite position – that because the Information Subpoena and the motion papers were served on Hersh only and not Omodunbi, the judgment – debtor, service

of the Information Subpoena and the subsequent motion was defective and the requested relief should be denied.

431.    Flabbergasted by this response, G&B vigorously opposed Omodunbi's argument, and further asserted that Omodunbi was attempting to pervert the rules which were designed to protect attorneys who had actually terminated their representation of a client, not to be used as another coercive tool to force collection attorneys to have to resume direct communications with a represented debtor currently prosecuting affirmative FDCPA claims and attempting to negotiate a global settlement.

432.    Ultimately the trial court was not persuaded by Omodunbi's frivolous argument and granted the motion finding that Omodunbi was deemed served with all applicable papers.

433.    Specifically, on January 11, 2019, the Honorable Mary K. Costello of the New Jersey Superior Court ("Judge Costello") issued an Order finding that "Omodunbi and... Hersh ha[d] violated [Rutgers'] rights as a litigant," ordered Omodunbi to "immediately furnish answers" to the Information Subpoena and further stated that if Omodunbi "fail[ed] to comply with the Information Subpoena within ten (10) days of the certified date of personal service or mailing" of the order, "a warrant for [Omodunbi's] arrest may issue out of [the] Court without further notice." See **EXHIBIT 26** at pg 4.

434.    Thereafter, on that same day, G&B sent a copy of the 01/11/2019 Order along with another copy of an Information Subpoena to Hersh via regular mail retaining a copy of a certificate of mailing as proof thereof together with a cover letter which reiterated that if they were not in receipt of Omodunbi's certified answers to the Information Subpoena on or before January 21, 2019, they would "have no choice but to proceed with a request to the Court to issue a warrant for [Omodunbi's] arrest." See **EXHIBIT 26** at pg 3.

435.    After the ten day window had passed, G&B again followed up with Hersh about the unanswered Information Subpoena and when Hersh responded by insulting them and otherwise acting in an unprofessional and unethical manner, G&B again sought court intervention to obtain answers to the information without having to resort to pursuing an arrest warrant with their 01/22/2019 filing.

436.    As seen therein, G&B wrote to Judge Costello "in an attempt to have the Information Subpoena answered without issuing an arrest warrant[,]" and specifically sought assistance by requiring that Hersh be held personally responsible for ensuring Omodunbi's compliance on account of their special relationship and Hersh's position of trust and confidence with his client Omodunbi. See, **EXHIBIT 26**.

437.    At the hearing however, at Omodunbi's specific instructions, Hersh committed a fraud on the Court by claiming that Hersh was no longer representing Omodunbi with respect to the underlying judgment – debt and the state court ultimately instructed G&B to resume communicating with Omodunbi directly.

438.    Subsequently, the state court explicitly eliminated available alternatives for obtaining Omodunbi's compliance by amending its 01/11/2019 Order to remove any reference to Attorney Hersh as bearing any personal responsibility for his client's defiance of the Court's order.

439.    A true and correct copy of this 01/23/2019 Amended Order has been attached hereto as **EXHIBIT 28**.

440.    Thereafter, left with no other options, G&B was forced to resume communicating with Omodunbi directly in their attempts to compel compliance with the Court's Order and answers to the information subpoena.

441.    That same day, G&B sent Omodunbi the instant 01/23/2019 Email with another copy of the Information Subpoena and the 01/11/2019 Court order compelling his answers.

442.    Importantly, although Hersh had initially informed Omodunbi of his obligation to submit answers to the Information Subpoena and had sent G&B's correspondence with Hersh and public filings to Omodunbi in which they reiterated their reluctance to resorting to applying for an arrest warrant, at that point time, Omodunbi had already moved beyond the jurisdiction of the New Jersey Courts but continued to ignore G&B's attempts to obtain answers to their post-judgment discovery efforts, intentionally inducing them into taking further steps to compel answers and knowing that it would just be a waste of time.

443.    Moreover, even though Omodunbi knew that G&B had repeatedly expressed their reluctance for having to resort to an application for an arrest warrant, when preparing their Second Amended Complaint, Omodunbi specifically instructed Hersh to perpetuate this fraud on the court that Hersh was no longer representing Omodunbi with regards to the judgment and further instructed Hersh to omit the 01/22/2019 Emails and 01/22/2019 filing in bad faith, and for the purposes of prosecuting these frivolous allegations that G&B threatened Omodunbi with his imminent arrest, when in reality, G&B was transparent the entire time about their reluctance to resort to applying for an arrest warrant in order to obtain answers to their discovery in aid of execution.

444.    Accordingly, where Omodunbi's repeated instances of instructing Hersh to falsify and omit information and commit a fraud on the court for the purposes of avoiding discovery in aid of execution and continuing to prosecute this particular claim is clearly a violation of 15 U.S.C § 1692k(a)(3), and where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's conduct, G&B requests an award of actual and special

damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  and such other relief as may be available under the law or in equity.

445.     Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

### COUNT NINE – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
#### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

446.     Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

447.     Pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692d(6), G&B seeks a declaration from this Court that they did not violate the FDCPA with their January 30, 2019 phone call & voicemail in which Daniel Berger attempted to call Omodunbi in an effort to obtain answers to their lawful post-judgment discovery requests without resorting to an application for Omodunbi's arrest because Omodunbi already knew who Daniel Berger was, and Daniel Berger's voicemail which disclosed his identity constituted meaningful disclosure of the caller's identity.

448.     Specifically, as set forth more fully herein, G&B was forced to resume communicating with Omodunbi directly after Hersh, at Omodunbi's instructions, committed a fraud on the NJ State Court by stating that he no longer represented Omodunbi and therefore G&B would need to contact Omodunbi directly for purposes of pursuing their post judgment discovery in the Collection Action.

449.    At this point in time, Omodunbi had had at least two interactions with Daniel Berger, including his May 15, 2018 deposition which lasted over three hours, and the January 23, 2019 Email.

450.    In fact, after receiving their 01/23/2019 Email, which Omodunbi ignored specifically because he was already beyond the reach of the New Jersey Courts, Omodunbi sent Daniel Berger an email on January 29, 2019 at 2:41 PM, a true and correct copy of which has been attached hereto as **EXHIBIT 29**.

451.    As seen therein, Omodunbi sent an email directly to Daniel Berger, without cc'ing Hersh, which completely ignored the matters concerning his willful violation of court orders, and merely stated that he "would like to resolve the outstanding judgment" and asked for "the bottom line, lump sum figure[.]"

452.    As further seen therein, the email contained no subject line, and also was not cc'ed to Ed Berger, but specifically referred to Daniel Berger as "Mr. Berger" and sought to resolve "the" judgment, and accordingly, Omodunbi was already well aware of who Daniel Berger was.

453.    The following day, Daniel Berger attempted to contact Omodunbi in response to his email and specifically because he was concerned that Omodunbi was forcing their hand in having to apply for an arrest warrant, however, upon dialing the number, he was unable to reach Omodunbi, and Omodunbi's voicemail message did not identify Omodunbi as the owner of the phone.

454.    Thereafter, in accordance with G&B's office policy of leaving detailed voicemails only when the debtor is identified on their voicemail, Daniel Berger merely identified himself on

the voicemail stated that the message was intended for Omodunbi and requested a call back providing his number.

455.    Accordingly, to the extent that Omodunbi was already aware of who "Mr. Berger" was, identifying himself as "Dan Berger" necessarily constituted meaningful disclosure of his identity.

456.    Thus, where Omodunbi was already aware of who Daniel Berger was when he left the instant voicemail identifying himself as the caller – the attorney that deposed Omodunbi for three hours in May of 2018, and the same attorney who sent Omodunbi the 01/23/2019 Email and the same attorney that Omodunbi contacted by email only one day prior, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 15 U.S.C. § 1692d(6) that they could not have violated federal law where the voicemail meaningfully disclosed the caller's identity, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

457.    Additionally, pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, 15 U.S.C. § 1692e(11) and 15 U.S.C. § 1692k(c), G&B seeks a declaration from this Court that they did not violate the FDCPA with their January 30, 2019 phone call & voicemail in which Daniel Berger attempted to call Omodunbi in an effort to obtain answers to their lawful post-judgment discovery requests without resorting to an application for Omodunbi's arrest because Omodunbi's voicemail did not identify himself as the owner of the voicemail and G&B could not be sure they were communicating "with" the consumer.

458.    Specifically, as was set forth above, § 1692e(11) is only applicable to communications "with the consumer[,]" however, at the time that Daniel Berger left the

voicemail, he could not be sure that he was communicating "with" Omodunbi, a fact that he could only confirm after Omodunbi, himself, confirmed his identity.

459.    Conversely, Daniel Berger would have been prohibited from "communicat[ing]... in connection with the collection of [the] debt with any person, other than the consumer" based on 15 U.S.C. § 1692c(b), except as provided for in 15 U.S.C. § 1692b, but was further prohibited from revealing to any such third parties that he was a debt collector.

460.    Accordingly, to the extent that Omodunbi's voicemail message did not identify himself as the person with whom G&B would have been communicating with at the time Daniel Berger left the voicemail message, § 1692e(11)'s requirement was not yet applicable and would not have been applicable until such time that G&B could be reasonably certain that the communication was "with" the consumer – either by Omodunbi identifying himself over the phone, or by sending a different form of a communication to a physical or electronic mailing address.

461.    Thus, where § 1692e(11)'s requirement was not yet applicable, Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 15 U.S.C. § 1692e(11) that they could not have violated federal law under those circumstances, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

462.    Alternatively, to the extent that 15 U.S.C. § 1692k(c) would prevent liability where Daniel Berger could not be certain whether or not he was communicating with Omodunbi because Omodunbi did not answer the phone and identify himself and neither did his voicemail, and where G&B would have no means of controlling Omodunbi's decision not to identify himself on his voicemail, Plaintiffs request an order and decree from this Court pursuant to 28

U.S.C. § 1331, 28 U.S.C. § 2201, 15 U.S.C. § 1692e(11), and 15 U.S.C. § 1692k(c) that they could not have violated federal law under those circumstances, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

463.    Furthermore, where Plaintiffs have suffered and continue to suffer ongoing injuries as a result of the Defendants' bad faith prosecution of this claim primarily for the purposes of harassment, Plaintiff's also seek an award of damages as authorized by 15 U.S.C § 1692k(a)(3).

464.    Specifically, Omodunbi knew exactly who Daniel Berger was as he had sent "Mr. Berger" an email to his office email address the day prior, and accordingly, in leaving his name, Daniel Berger meaningfully disclosed his identity and Omodunbi has clearly omitted the existence of his knowledge about Daniel Berger's identify in bad faith and for the specific purpose of harassing G&B with this frivolous claim, and to needlessly increase G&B's litigation costs and for coercion and G&B requests any and all damages as are authorized by law.

465.    Moreover, Omodunbi also knows that his voicemail does not identify himself, however, knowing that this fact would be fatal to this particular claim under § 1692e(11), Omodunbi lied to Hersh and denied knowing whether or not his voicemail identifies Omodunbi as the owner of the phone line.

466.    As further evidence of his bad faith and malicious and unlawful conduct, Omodunbi was served with Requests for Admissions in the FDCPA litigation in September of 2019, which specifically sought admissions to these factual issues:

467.    In Plaintiffs' Request For Admissions No. 25, Plaintiff sought an admission from Omodunbi that "[o]n January 30, 2019, DAB called [Omodunbi] on his cell phone and received

his voicemail, however, [Omodunbi's] voicemail [did] not identify [Omodunbi] as the owner of the phone, but merely recites the telephone number that was dialed." See, **EXHIBIT 23**.

468.     Thereafter, Omodunbi and Hersh discussed this particular request and Hersh, being the scrupulous attorney that he is, advised Omodunbi that if he knew that his voicemail did not identify himself, or was able to check and confirm the same, they would have to admit to this particular request.

469.     However, Omodunbi was adamant that they should not admit and specifically lied to Hersh saying that he couldn't tell, and by the time they returned to the Requests over a year later on October 9, 2020, Omodunbi again lied to Hersh about what was contained on his voicemail, and thereafter responded to this request for admission by admitting to the fact that the phone call was made, but claimed that Omodunbi "lack[ed] knowledge or information to either admit or deny the remaining [sic] of the Request." See, **EXHIBIT 23**.

470.     Accordingly, where Omodunbi's repeated instances of instructing Hersh to falsify and omit information and commit a fraud on the court for the purposes of prosecuting this particular claim is clearly a violation of 15 U.S.C § 1692k(a)(3), and where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's conduct, G&B requests an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  and such other relief as may be available under the law or in equity.

471.     Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against

all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

### COUNT TEN – ACTION UNDER 28 U.S.C. § 2201 and 15 U.S.C. § 1692k
(PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

472.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

473.    Pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 15 U.S.C. § 1692c(a)(1), G&B seeks a declaration from this Court that they did not violate the FDCPA with their January 31, 2019 email to Omodunbi, responding to his email request from 90 minutes prior, because the communication was not effectuated at an inconvenient time. True and correct copies of Omodunbi's 01/31/2019 Email request and Plaintiff's responsive email sent shortly thereafter have been attached hereto as **EXHIBIT 30** and **EXHIBIT 31**.

474.    Just the opposite, when G&B sent the 01/31/2019 Email, they had knowledge of how emails worked – that they are sent to a recipient's electronic inbox and sit there unless and until such time that it is convenient for the recipient to check his electronic inbox and read the email.

475.    Moreover, G&B also knew that the inherent nature of communicating via email is that if the recipient, for his convenience, needs to remain completely ignorant of what electronic mail he has received until the time when it is convenient for him to check, he will not enable email notifications on his smart phone, or will not have email on his smart phone at all, and will instead only learn what emails he has received when he opens his computer or laptop and purposefully checks his electronic inbox precisely at such time that it would be convenient for him to read such electronic communications.

476.     Conversely, G&B also knew that if Omodunbi is the kind of person that finds it convenient to receive push notifications that he has received an email so as to remind him to read such correspondence when he has the time, or because he wants to know immediately when he receives a response to his emails, then sending an email would also be convenient for Omodunbi for those very same reasons.

477.     And accordingly, G&B had knowledge about what would be a convenient method and manner of communicating with Omodunbi and did, in fact, communicate with Omodunbi at a convenient time and in a convenient manner, because the very nature of communicating via email is that it affords the recipient total control over the time and manner in which he receives and reads such communications.

478.     Moreover, to the extent that Omodunbi had repeatedly ignored G&B's efforts to obtain answers to the information subpoena and instead had made repeated requests, individually and through Hersh, for updated accounting on the Judgment balance and a settlement demand, combined with the fact that Omodunbi had declined to return G&B's phone call instead electing to communicate via email, G&B knew that the most convenient thing to do, would be to draft a response to Omodunbi's repeated requests as soon as possible, and thereafter transmit it to him via email, so that he could open and read it as soon as it was convenient for Omodunbi.

479.     Accordingly, where G&B's 01/31/2019 Email specifically responding to Omodunbi's earlier request was communicated to Omodunbi in precisely the manner and method that was most convenient to Omodunbi – via email, as soon as possible, so that Omodunbi could then read the response and look over the information he was asking for **at his earliest convenience** – Plaintiffs request an order and decree from this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 15 U.S.C. § 1692c(a)(1) that they could not have violated federal

law under those circumstances, and further seek any appropriate equitable relief to enjoin all Defendants, and their agents, from prosecuting a claim for this violation and from taking any further steps on relation thereto.

480.    Furthermore, where Plaintiffs have suffered and continue to suffer ongoing injuries as a result of the Defendants' bad faith prosecution of this claim primarily for the purposes of harassment, Plaintiff's also seek an award of damages as authorized by 15 U.S.C § 1692k(a)(3).

481.    Specifically, Omodunbi had already testified at his deposition in the state case that his experience with and usage of email is that of most consumers in the 21st Century, which is that they get "so many Emails every day" so they ignore or forget about the emails that are not relevant or important to them, and conversely, they will circle back to those that are, and specifically they will do so at a time that is inherently convenient for them to do so. See, e.g. **EXHIBIT 18** at 81:24 – 32:1.

482.    Further, Omodunbi personally knows that the instant 01/31/2019 Email was sent in exactly the manner that he was asking for and in the manner that was most convenient for him – by way of email to be opened and viewed at Omodunbi's earliest convenience.

483.    In fact, as seen in the email that Omodunbi sent to G&B at 7:52 PM the same day, Omodunbi asked to be in receipt of that exact information, acknowledged that he had received G&B's voicemail but preferred to correspond via email, and repeated his prior requests for the same information that G&B later provided to him. See **EXHIBIT 30** and **EXHIBIT 31**.

484.    However, as a clear demonstration of his bad faith motives, Omodunbi deliberately directed Hersh to omit this earlier email at 7:52 PM from his Second Amended Complaint specifically for the purposes of perpetrating yet another fraud on the court and to

continue to litigate this claim in bad faith and for the purposes of harassment and needlessly increasing G&B's litigation costs and in order to coerce a compromise of the underlying judgment – debt.

485.    Furthermore, this knowing omission from the Second Amended Complaint is yet another instance of the Defendants' attempts to corruptly influence the United States District Court in the discharge of its official duties or otherwise corruptly endeavor to influence the due administration of justice by, acting with an improper purpose, making false statements and withholding or concealing a document or other information in violation of 18 U.S.C. § 1503(a).

486.    Similarly, Omodunbi did in fact, open G&B's 01/31/2019 Email at a time that was convenient for him, and is acutely aware of the fact that this particular claim is a palpable sham, however, he continues to litigate it in bad faith and for purposes of harassment, as further evidenced by his inconsistent and evasive responses to Plaintiffs' discovery in the FDCPA litigation.

487.    For example, Omodunbi was served with Plaintiffs' First Set of Interrogatories in September of 2019, which specifically asked Omodunbi to "identify... the basis for [his] contention that" any specific "communication was improper in any manner," specifically including the 01/31/2019 Email, and in response, Hersh eventually prepared a lengthy response for Omodunbi to review and sign, which specifically excluded the 01/31/2019 Email that Omodunbi claims was improper because it was sent at an inconvenient time.

488.    A true and correct copy of Omodunbi's responses to the Plaintiffs' Interrogatories containing the interrogatories that were propounded, that were completed and sent via email on or about October 27, 2020, has been attached hereto as **EXHIBIT 32**.

489.    As seen in Omodunbi's Responses to Interrogatories, at answer to Interrogatory Number 5, Hersh listed a number of communications in chronological order and lists the January 30, 2019 phone call and voicemail and then goes on to list some communication that transpired later in July of 2019, and never mentioned the 01/31/2019 Email. See, **EXHIBIT 32**.

490.    Specifically this was so because at the time Hersh prepared these answers in late October of 2020, he knew this claim was frivolous since Omodunbi would have necessarily opened an email at a time that was convenient for him, and Omodunbi did not notice that this communication was left out of their answers to interrogatories.

491.    Conversely, with regards to the Requests for Admissions that were also served on Omodunbi in September of 2019, Plaintiffs specifically sought an admission from Omodunbi that the 01/31/2019 Email "was sent specifically in response to [Omodunbi's] email from 7:52 PM[,]" at Request Number 29, and that Omodunbi "opened and read the email from Defendants... at a time that was convenient for" him, at Request Number 31. See, **EXHIBIT 23**.

492.    On this occasion, Hersh again discussed both of these requests with Omodunbi as well, and again, being the scrupulous attorney that he is, Hersh asked Omodunbi to look through his emails to see if he could find the earlier email at 7:52 PM and also asked Omodunbi about the circumstances concerning his receipt and review of the 01/31/2019 Email.

493.    Upon this initial discussion, Omodunbi did not commit to any particular factual version but stated that he would look through his records and check and thereafter, in furtherance of Omodunbi's bad faith motives and actual malice, upon locating the 7:52 PM email that he sent to G&B in his sent email folder, Omodunbi deleted it – once again tampering with evidence – and thereafter lied to Hersh stating that he hasn't been able to locate any such email.

494.    A year or so later, when circling back to the discovery requests in October of 2020, the two submitted their response to request number 29 stating that "[a]fter making a reasonable inquiry, [Omodunbi] lacks knowledge or information to either admit or deny this Request since the information [Omodunbi] knows or can readily obtain is insufficient to enable [Omodunbi] to admit or deny." See, **EXHIBIT 23**.

495.    Additionally, Omodunbi also denied Request Number 31 which sought the admission that he opened and read the 01/31/2019 email at a convenient time, however at the time that he and Hersh responded, Omodunbi wasn't directly asked if it was true as Hersh was in a rush, which was also why Hersh failed to provide an explanation for the reasons for Omodunbi's denials of any of the Requests for Admissions – which required an explanation of the reasons for any denial – however because Hersh neglected this obligation, Hersh was unaware of the lie he was facilitating when providing Defendants with the instant response. See, **EXHIBIT 23**.

496.    Conversely, two weeks later, when Hersh was actually required to type out written answers in response to the Interrogatories, as noted above, he omitted this false claim about 01/31/2019 Email entirely, and Omodunbi did not notice.

497.    Accordingly, where Omodunbi's repeated instances of causing Hersh to falsify and omit information and commit a fraud on the court, and further destroyed evidence for the purposes of prosecuting this particular claim is clearly a violation of 15 U.S.C § 1692k(a)(3), and where G&B has suffered, and continues to suffer ongoing harm and injuries as a direct result of Omodunbi's conduct, G&B requests an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes and such other relief as may be available under the law or in equity.

498.     Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the wrongful, malicious and bad faith continuation of this claim, Plaintiffs request an award of actual and special damages pursuant to 15 U.S.C § 1692k(a)(3) as well as analogous Pennsylvania Common Law and/or applicable statutes  against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

## COUNT ELEVEN – ABUSE OF PROCESS
### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

499.     Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

500.     Throughout the course of the Collection Action proceedings, as well as the NJ District Court Action proceedings, G&B was subjected to numerous pecuniary and economic injuries as a direct and proximate result of Defendants' misuse of certain legal processes to accomplish an ulterior purpose for which they were not designed and Defendants therefore are liable to G&B for those injuries.

501.     Specifically, G&B has suffered pecuniary and economic injuries in the form of substantial interference with their business by diverting their efforts from profitable matters consuming significant amounts of limited time and resources. Additionally, G&B has suffered further pecuniary losses in the form of out of pocket costs as well as injuries to their professional reputation. And furthermore, G&B continues to suffer significant economic and reputational harm actually and proximately resulting from further increased insurance premiums based on the expensive and protracted nature of these litigation proceedings, specifically resulting from Omodunbi's further acts committed during the course of the instant proceedings that constituted

a misuse of those proceedings in order to accomplish an ulterior purpose that the processes were not designed for.

502.    During the course of the Collection Action proceedings, Omodunbi delayed for over a year, until opposing Rutgers' Motion for summary judgment, which was well after the contract claim had been amended to a claim for a breach of the underlying promissory notes, to plead his only colorable defense to the pre-amendment contract action based on the tuition account – Omodunbi's claim that he should have received some kind of tuition reduction when he "took a leave absence."

503.    Rather than pleading this as a defense to the initial complaint, Omodunbi, through Hersh, responded with a single paragraph answer generally denying all of the allegations. This answer was a violation of court rules, and was designed to deny G&B and Rutgers the ability to assess the merits of Omodunbi's actual defense, and, more importantly, as was later revealed, it was specifically done for the ulterior improper purpose of increasing G&B's and Omodunbi's litigation costs, both to gain an advantage in their negotiations with G&B and Rutgers, and to artificially inflate Omodunbi's damages claim in the FDCPA litigation.

504.    Additionally, during the Collection Action proceedings, Omodunbi, through Hersh, abused court processes by re-submitting the same general denial even after the complaint was amended to specifically include the signed promissory notes. In the present case, Omodunbi re-asserted the same general denial of his signatures on the various promissory notes. Moreover, this was done, not for the legitimate and/or proper purpose of advancing an honest, albeit unreasonable, belief that he never signed the promissory note to begin with.

505.    Just the opposite, Omodunbi, through Hersh, specifically re-alleged this general denial primarily for the improper purpose of causing additional unnecessary litigation expenses,

both to G&B and to himself. Specifically, the purpose of this particular tactic was to cause G&B to have to incur the expenses associated with taking Omodunbi's deposition, and for the purposes of adding to Hersh's attorney fees to further inflate Omodunbi's damage claim in the FDCPA action.

506.    Specifically, Omodunbi did discuss with Hersh the issue of his signatures on the promissory note, and Hersh did advise Omodunbi that if he recognized the signatures as being his, he would have to admit to same, as required by rules of court. However, Omodunbi specifically employed a scheme whereby he would simply assert that he did not remember signing any promissory notes, and that he couldn't tell whether or not the signatures were his. Thereby allowing Omodunbi to avoid having to admit to same at the pleading stage and also avoid any potential consequences for committing perjury since it would be impossible to prove that his statements about not remembering or recognizing the signatures were knowingly false.

507.    Further, Omodunbi, through Hersh, compounded this abuse by thereafter perverting the two deposition transcripts of the testimony of Rutgers' two witnesses by omitting from the certified transcript copies of the exhibits that were introduced and authenticated during their testimony, specifically including the signed promissory notes.

508.    Also during the Collection Action proceedings, Omodunbi, through Hersh engaged in additional further acts by harassing G&B with absurd and irrelevant discovery requests and the subsequent filing of a motion to dismiss based on G&B's alleged failure to comply with those discovery requests.

509.    Specifically, Omodunbi, through Hersh, served G&B with numerous discovery requests that sought information and/or documents that were either irrelevant, were already in his possession, or duplicative of requests for information that had already been disclosed.

510.    For example, Omodunbi sought answers to numerous interrogatories and requested documentation concerning an assignment of the debt even though the debt was never assigned since Rutgers was the original creditor.

511.    Additionally, Omodunbi served numerous discovery requests seeking copies of the promissory notes and correspondence between G&B and Omodunbi even though G&B had already sent numerous copies of the promissory notes to Hersh and Omodunbi was already in receipt of the letters that were sent to him by G&B.

512.    Moreover, Omodunbi, through Hersh, further prepared and filed a motion to dismiss the amended complaint on the alleged basis of G&B's failure to respond to Omodunbi's discovery requests, which was ultimately denied, for the improper purpose of causing additional unnecessary litigation expenses both to G&B, in order to gain an advantage in negotiations with G&B, and to himself once again for the improper purposes of inflating his damages claimed in the FDCPA action.

513.    Finally, Omodunbi, through Hersh, engaged in further acts in the Collection Action proceedings that amounted to abuse of process by opposing the motion to enforce litigant's rights and failing to indicate during those proceedings that Omodunbi had already moved to Pennsylvania. Specifically, Omodunbi, through Hersh, argued that he was never served with an information subpoena or a motion to enforce litigant's rights, and further instructed Hersh to ask the state court to force G&B to direct any further attempts to collect on the judgment through Omodunbi, and not Hersh, once again not for any legitimate or permissible purpose: such as advancing the argument, in good faith, that he was never provided adequate notice with the Information Subpoena when it was sent to Hersh.

514.    Rather, Omodunbi made these arguments, through Hersh, for the improper purpose of increasing his own litigation expenses to manufacture and/or inflate his damages claim in the FDCPA action, and for needlessly increasing G&B's litigation expenses.

515.    Moreover, Omodunbi further argued, through Hersh, that Hersh no longer represented him with respect to the collection matter, even though Hersh was still representing Omodunbi, for the specific improper purpose of avoiding discovery in aid of execution.

516.    Furthermore, in citing and relying on N.J. Ct. R. 1:11-3, which discusses the termination of an attorney of record's responsibilities to a trial court in his opposition to the December 2018 motion to enforce litigant's rights, an argument that was ultimately rejected by the state court judge, Omodunbi specifically relied on and utilized legal provisions which were designed to protect attorneys in instances where there representation has actually terminated, as a means for avoiding post judgment discovery.

517.    Additionally, Omodunbi has also committed numerous acts which constitute abuse of process in the FDCPA Litigation proceedings throughout, further compounding the economic and pecuniary harm to G&B as previously described.

518.    As noted above in the various counts, at the time that Omodunbi filed his motion to amend the pleadings on June 28, 2019 in the FDCPA litigation which sought to file his Second Amended Complaint, robust discovery, motion proceedings, and the entry of a final judgment in the Collection Action had already adduced numerous admissions and resulted in a final adjudication on a number of facts which would prove bad faith/sham litigation.

519.    Similarly, under the law, although a litigant is protected when the purpose of bringing a claim or claims is to advance an honest, albeit unreasonable, belief in the factual averments that the claims rely on, when a litigant is aware of the falsity of the requisite facts, he

forfeits any such protection that might have otherwise been afforded him and where he has utilized certain legal processes for a purpose that is not the proper object for which the processes were designed, he is liable to the Plaintiff for the injuries caused by such abuses.

520.    In the present case, it is clear that Defendants have brought the instant FDCPA claims not for the purposes of seeking redress for the Plaintiffs violations of the FDCPA's provisions, but rather, it was brought entirely for the improper purpose of extorting a favorable settlement of the underlying debt.

521.    Indeed, the fact that Defendants rejected the Plaintiffs December 15, 2017 offer of Settlement for more than what Omodunbi might have otherwise recovered with a judgment in his favor, countering, two months later, with a demand to settle the underlying debt in the Collection for a fraction of what was owed, is sufficient proof, in and of itself, that the true purpose of the FDCPA action and the specific acts taken therein were all perversions of the proceedings.

522.    More egregious, however, were the numerous instances in which one or more Defendants engaged in overtly fraudulently conduct in order to avoid the dismissal of their frivolous FDCPA case in order to continue in their efforts to extort a settlement of the underlying debt.

523.    As noted above, Defendants submitted numerous fraudulent filings in order to advance their bogus claims about the Plaintiffs' failure to include the verification notice in their Initial Communication.

524.    As discovery in the Collection Action, revealed that this claim was not only frivolous but that Defendants were continuing to prosecute it in bad faith, Defendants destroyed evidence, and eventually submitted a sham affidavit with perjured testimony, all in an effort to continue the sham, for the perverse purposes of compromising the underlying debt.

525.     Similarly, Defendants knowingly and intentionally concealed material facts about Hersh's failure to respond to the Plaintiffs' 1/27/2017 Email and his failure to raise any objection to their method of service, in numerous filings for the purposes of avoiding the dismissal of their FDCPA that was intended solely as a means of extorting a compromise of the underlying the debt.

526.     Further, Defendants knowingly, and intentionally misrepresented the terms of the promissory notes that Omodunbi signed evidencing the debt and further employed a sham strategy of claiming an inability to recognize whether the signature on the promissory notes were his, specifically for the purposes of running up an exorbitant bill in the Collection Action for the purposes of claiming those fees as damages in the sham FDCPA Action.

527.     Finally, Defendants repeatedly engaged in discovery abuses during the FDPCA action once again, for the purposes of avoiding a dismissal of the sham litigation.

528.     For example, as noted above, Defendants intentionally delayed in responding to discovery requests that were served on them a year prior, including requests for admissions.

529.     Thereafter, Defendants sought permission to submit late responses, only after discovery had closed, specifically employing the same strategy of claiming an inability to recall being served with the discovery demands.

530.     Eventually Defendants responded by asserting outlandish and nonsensical objections, or again claiming a lack of knowledge or recollection with respect to numerous requests for admissions in an effort to avoid the inevitable dismissal of their frivolous lawsuit.

531.     Similarly, Defendants submitted doctored documents and evidentiary materials, and concealed original documents that they were required to produce for the Plaintiffs' copying

and inspection, again for the purposes of compounding litigation expenses and avoiding the inevitable dismissal of their frivolous lawsuit.

532.    Finally, Defendants intentionally submitted incomplete answers in order to deprive the Plaintiffs of their ability to establish the fraudulent nature of the Defendants' claims, by failing to identify the alleged "friends" that Omodunbi claimed to have borrowed money from to pay a portion of Hersh's fees, and that Omodunbi claimed he learned that he had a right to seek verification of the debt from.

533.    As set forth throughout the complaint, the above described acts and omissions all of which constitute numerous instances of abuse of process, have directly and proximately caused harm to Plaintiffs as described herein, and they are entitled to appropriate relief.

534.    Alternatively, to the extent that Omodunbi relied, in any manner, on Hersh's directions or legal advice in connection with the within described abuses of court processes, and to the extent that Hersh, as attorney of record in both lawsuits and as the individual bearing responsibility for his professional misdeeds, committed in violation of Pennsylvania Common Law Plaintiffs request an award of actual, special, and punitive damages against all Defendants jointly and severally, and such other relief as may be available under the law or in equity.

## COUNT TWELVE – RICO VIOLATIONS
### (PLAINTIFFS VS. ALL DEFENDANTS JOINTLY AND SEVERALLY)

535.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

536.    As set forth above, Omodunbi and Hersh Defendants, collectively, had formed an "association-in-fact" enterprise with the common purpose of avoiding/defeating/ and/or minimizing Omodunbi's debt that he owed to Rutgers that was the subject of the Collection Action.

537.    Additionally, as set forth above, the enterprise has existed since on or about January 20, 2017 since the formation of Omodunbi's and the Hersh Defendants' attorney-client relationship, and continues to exist to this day, where the efforts of the enterprise in avoiding/defeating and/or minimizing Omodunbi's debt that he owes to Rutgers, especially since it was reduced to judgment, have primarily shifted the focus of its activities to the NJ District Action up until that case was terminated on March 30, 2023.

538.    As also set forth above, the activities of this association-in-fact enterprise necessarily affect interstate commerce.

539.    Further, both Omodunbi, and the Hersh Defendants, are considered "persons" as defined by 18 U.S.C. § 1961(3), that are associated with the enterprise and have conducted the enterprises affairs.

540.    Further, as set forth above *ad nauseum*, and as summarized below, Defendants have either personally, or have conspired to, commit numerous predicate acts that are defined as racketeering activity.

541.    First, 18 U.S.C. §§ 1341 and 1343, involving mail fraud and wire fraud are implicated where the Defendants, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" utilize the mail, or the wires, in order to "execute" on such scheme or artifice. Specifically, where the Defendants transmitted by both the wires and the mail, numerous fraudulent filings, as already set forth above, Defendants have committed numerous instances of predicate acts prohibited by 18 U.S.C. § 1961(1).

542.    Second, 18 U.S.C. § 1503(a), involving obstruction of justice, is implicated where Defendants have "corruptly... endeavor[ed] to influence any... officer... of any court of the

United States... in the discharge of his duties... or [otherwise] corruptly... endeavor[ed] to influence, obstruct, or impede, the due administration of justice." Specifically, where Defendants have, "acting with an improper purpose" utilized "false or misleading statement[s]" and have "with[held], conceal[ed], alter[ed], or destroy[ed]... document[s] or other information" in their submissions to the United States District Court for the District of New Jersey, and the New Jersey Superior Court, for the purposes of delaying or undermining the discovery of the truth, as already set forth above, and explained herein, Defendants have further committed numerous instances of predicate acts prohibited by 18 U.S.C. § 1961(1).

543.    Finally, 18 U.S.C. §§ 1512(b) and (c), involving tampering with witnesses and/or evidence, is implicated where Defendants have "corruptly... alter[ed], destroy[ed]... or conceal[ed] a record, document, or other object...  with the intent to impair the object's integrity or availability for use in an official proceeding" and where the Hersh Defendants have corruptly persuaded or engaged in misleading conduct towards Omodunbi with the intent to influence his testimony in the NJ District Action. Specifically where Defendants have corruptly destroyed or concealed the Initial Communication and the enclosure that was sent with it, have also corruptly destroyed or concealed the September 13, 2017 Letter that was sent only to Hersh, and where Defendants have either conspired to testify falsely or where Hersh has corruptly persuaded Omodunbi to testify falsely at his deposition and to submit the perjured affidavit in relation to the NJ District Action, Defendants have further committed numerous instances of predicate acts prohibited by 18 U.S.C. § 1961(1).

544.    Thus, all of the Defendants, who are persons associated with an enterprise, conducted the enterprise's affairs through a pattern of racketeering activity in violation of 18

U.S.C. § 1962(c), with their commission of over a dozen instances of racketeering activity between June 16, 2017 and December 27, 2022.

545.    Further, Plaintiffs were injured in their business and property as a direct and proximate result of the aforementioned racketeering activities – specifically Plaintiff's suffered out of pocket costs and expenses incurred, both as a result of continuing to defend in the NJ District Court Action as well as in having to incur substantial, unreimbursed expenses during the prosecution of the Collection Action, together with additional pecuniary and economic losses in the form of increased malpractice insurance premiums, and erosion of their coverage limits on legal fees in defending the NJ District Court Action.

546.    Further, Plaintiffs have suffered significant injuries in the form of substantial interference with their business by diverting their efforts from profitable matters consuming significant amounts of limited time and resources, including time away from business development and long term business systems maintenance and updates, all of which has cost Plaintiffs significant sums.

547.    Additionally Plaintiffs have also suffered significant injuries to their professional reputations as a result of the protracted and expensive nature of the NJ District Court Action proceedings. Furthermore, as a direct result of the above described conduct Plaintiffs have also lost business, and have suffered pecuniary and economic injuries in the form of their lost fees for their professional services in the underlying Collection Action.

548.    Accordingly, Plaintiffs bring this suit for damages against all Defendants under 18 U.S.C. § 1964(c) and as a result of the violations of the RICO Act by Defendants, identified herein, all Defendants are liable to the Plaintiffs, jointly and severally, for damages to include:

statutory damages, actual damages, special damages, punitive damages, costs of this action and attorney's fees.

## **PRAYER FOR RELIEF**

Plaintiffs request judgment in their favor and against all Defendants as to the respective Counts for damages to include, statutory damages, actual damages, special damages, punitive damages, costs of this action, reasonable attorney's fees and such other relief as this Court deems just and proper.

Respectfully submitted,

*Gordin & Berger, P.C.*

Dated:  June 9, 2023

_/s/ Daniel A. Berger_____
Daniel A. Berger (319631)
GORDIN & BERGER, P.C
1760 Market Street, Suite 608
Philadelphia PA  19103
(215) 564-2031